# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 43724

BRET D. KUNZ and MARTI KUNZ,
Husband and Wife,

    Plaintiffs-Appellants,

v.

NIELD, INC., dba INSURANCE
DESIGNERS, an Idaho corporation,

    Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, April 2017 Term

2017 Opinion No. 86

Filed: July 11, 2017

Karel A. Lehrman, Clerk

Appeal from the District Court of the Sixth Judicial District of the
State of Idaho, Bear Lake County. Hon. Mitchell Brown, District Judge.

The judgment of the district court is <u>affirmed</u>. No attorney fees or costs
on appeal are awarded to either party.

Steven A. Wuthrich, Montpelier, attorney for appellant.

Echohawk Law, Pocatello, attorneys for respondent. Joseph T. Preston
argued.

_____

JONES, Justice.

## I. NATURE OF THE CASE

This appeal arises from an agent contract (the "2009 Contract") entered into between Bret Kunz ("Bret") and Nield, Inc. ("N.I.") authorizing Bret to sell insurance on behalf of N.I. N.I. is owned by two brothers, Bryan Nield ("Bryan") and Benjamin Nield. A dispute arose concerning the method and type of compensation available to Bret under the 2009 Contract. Bret filed a complaint seeking, *inter alia*, a declaratory judgment interpreting the 2009 Contract. The district court held, *inter alia*, that the 2009 Contract did not provide for profit sharing as Bret claimed. Bret and his wife, Marti, (collectively, the "Kunzes") appeal.

## II. FACTUAL AND PROCEDURAL BACKGROUND

1

The crux of this appeal is whether Bret is entitled to profit sharing payments under the 2009 Contract, and if so, what percentage of the profit sharing should be distributed to him. Profit sharing is a unique type of commission that insurance agents earn by meeting certain goals.[1] If an insurance agent qualifies for profit sharing, the payment is made the year after it is earned. Ordinary insurance commissions, which are a percentage of the premiums for new and renewed policies, are paid monthly.

The business relationship between Bret and N.I. began in 1996 when the parties entered into a written contract (the "1996 Contract") for Bret to sell insurance as a subcontractor for N.I. As a subcontractor for N.I., Bret worked under his brother Michael, who was also a subcontractor for N.I. and had been since 1982. Pursuant to a contract Michael signed with N.I. in 1982, he and N.I. split his book of business 50/50. While Bret's 1996 Contract was substantially similar to Michael's 1982 Contract, it did not contain a provision addressing the ownership of the book of business.

Bret and Michael agreed that Michael would cover all of the overhead expenses and Bret would receive the entire 80% monthly commission to which he was entitled under the 1996 Contract. Michael did not make any money from Bret, but received profit sharing from sales attributable to Bret due to the fact that Michael owned 50% of the book of business. According to Bret's testimony, he did not expect to receive profit sharing under his 1996 Contract because that contract did not address the ownership of the book of business.

On July 4, 2008, Michael died. Thereafter, the Kunzes purchased Michael's insurance agency and Michael's share of the business placed with N.I. from Michael's surviving spouse. Around October 2008, Bret and N.I. began to discuss the need for a new contract that would include an ownership provision similar to the ownership provision in Michael's 1982 contract. Bret testified that Bryan brought a draft of the 2009 Contract to his office that mirrored Michael's 1982 contract.

Sometime around the end of October, or the beginning of November 2008, Bret signed a final version of the 2009 Contract. Bret testified that he did not review the 2009 Contract closely and was not aware that the language therein was different from the language in the draft contract. Bret testified that at the time he signed the 2009 Contract, Bryan mentioned that "they had some

---

[1] Within the insurance industry, "profit sharing" and "contingent commissions" are used interchangeably.

pretty good profit sharing checks with [Michael]." Bret also recalled that between November 2008 and February 2009, Bryan mentioned the profit sharing checks again, likely in an attempt to motivate Bret to sell more insurance.

The pertinent provisions of the 2009 Contract are as follows:

(5) Responsibilities of Agent: The agent is a sub-contractor and as such has responsibility for all expenses related to his or her business. . . . Agent is to place all insurance business through company. Company has final underwriting authority for all business placed. . . . Agent is responsible for all premium and return commissions on business placed. When collections are not on time, deduction may be made from payment of commissions due. When the collection is completed the deducted commission will be paid.

(6) Responsibilities of Company: Company will maintain contracts with companies for placing of insurances. Company will do all billing and accounting functions (except collections). Agent is personally responsible for the collection of premiums and returned commissions on business placed. . . . [provide Bret with a commission check based on agreed percentages on the 15th of each month, and other functions based upon commission split and individual agreement].[2]

(7) Terms of Compensation: Agent will receive 80 percent of commissions received on insurance placed by agent with company. Company will receive 20 percent of commission placed by agent with company.

(8) Ownership: This is subject to change, but only as agreed between Company and Agent. The agent will own 50% of the book of business and the company will own 50% of the book of business.

As previously mentioned, the crux of this appeal is whether Bret is entitled to profit sharing under the 2009 Contract. More specifically, the issue is whether Bret is entitled to profit sharing for business he wrote with Gem State Insurance Company ("Gem State"), Farmers Alliance Mutual Insurance Company ("Farmers Alliance"), Acuity Mutual Insurance Company ("Acuity"), and Allied Insurance Company ("Allied"). The following is a summary of payments that N.I. made to Bret, which the Kunzes allege were profit sharing payments. In 2009, Bret received his first alleged profit sharing check from N.I. for 2008 business done with Gem State. Bret's work in 2009 did not qualify for profit sharing; accordingly, he did not receive an alleged profit sharing check in 2010. In 2011, Bret received an alleged profit sharing check for 2010 business done with Gem State and Acuity. Bret testified that, at the time he received the check,

---

[2] The bracketed language is the district court's paraphrasing of the 2009 Contract language. N.I.'s letterhead is printed over three lines of paragraph six rendering those lines illegible. The district court explained that its paraphrasing was based on an attempt to decipher the blocked content, the testimony of the parties, and reviewing other N.I. agent contracts.

he believed the amount he received was the appropriate percentage of the profit share. However, he did not have access to data to enable him to verify that he received the appropriate amount of the profit share. He did, however, have access to Gem State data because he had exclusive control over the Gem State book of business. In 2012, Bret received an alleged profit sharing check for 2011 work done with Gem State and Farmers Alliance. Bret testified that the profit sharing amount he received for Gem State business reflected a 50/50 split, but that the profit sharing for Farmers Alliance was less than 10% of the 80% he believed he was owed.

Bryan testified that N.I. does not pay profit sharing or contingent commissions and characterized the payments made to Bret as bonuses. Notwithstanding the foregoing, Bryan conceded that N.I. paid Bret 50% of the profit sharing that N.I. received from Gem State. The district court concluded that the Gem State profit sharing agreement was an "individual agreement," which Bryan described as follows:

> Gem State is a separate issue by itself. . . . the whole book of business is totally separate from ours. Therefore anything that he would receive as profit sharing is paid directly to Bret from Gem State. . . . So based on the Gem State paying him, since we own 50 percent of his book of business, therefore we receive 50 percent of the profit sharing.

On January 16, 2013, Bret sent Bryan a letter wherein he argued that the profit sharing split should be the same as the ordinary commission split, 80% to him, and 20% to N.I. In the letter, Bret conceded that the profit sharing split "was never addressed in the contract with [Michael] or me." On January 22, 2013, Bryan responded to Bret's letter and agreed that there was nothing in the 2009 Contract addressing the issue. Bryan explained that "[p]rofit sharing is a bonus based on loss ratios and book of business as you know. It is not based on commissions. The reason we have split profit sharing 50/50 is based on ownership, not commissions, and there are no guarantees on profit sharing." Nonetheless, Bryan included a check for 80% of the profit sharing for Gem State, which the district court concluded was a "one-time acquiescence and showing of good faith." Bryan testified that he gave Bret the 80% because it was "not worth the fight for a couple hundred dollars."

In April 2013, Bret received a check from N.I. for $424 with the notation "Profit Sharing 2012." On April 17, 2013, Bret emailed Bryan asking for the "company [the profit sharing check] came from" and the split percentage. Additionally, Bret asked for information regarding

the "profit sharing agreements with all of the companies." Bret testified that Bryan never responded to the email, but that he later learned the check was for business written with Acuity.

After the initiation of this action, Bret learned the amount of profit sharing that N.I. received from Acuity between 2009 and 2013 and from Farmers Alliance between 2010 and 2014. Bret argued that he did not receive the profit sharing to which he was entitled, considering the amounts received by N.I. Bret testified that he believes profit sharing should be calculated as follows:

> I would take the total written premium. So, for example, let's say the total written premium with Acuity was [$]200,000. If I had wrote [$]100,000 of that, then I would - - and let's say the total contingent payment was [$]10,000, and my book of business would have been responsible for [$]5,000 of that, then I would take 80 percent of that [$]5,000.

Conversely, Bryan offered the following testimony to explain N.I.'s bonus structure:

> [W]hat we do is get together and take any profits that we've earned. And if we decide to give out bonuses then we decide what - - we take and pay money to the company, see what is left, and determine what amount to pay for a bonus to whoever we feel it is necessary.

Bryan continued, explaining that N.I would not pay bonuses unless it received profit sharing from an insurance company.

Bret filed a complaint on November 13, 2013, with two causes of action.[3] First, Bret sought an accounting of all profit sharing, bonuses, incentives, or unpaid commissions that he generated, in whole or in part, between 2008 and 2012. In the event that the accounting revealed monies due, Bret requested a corresponding judgment. Second, Bret sought declaratory relief that: (1) the 2009 Contract included bonus commissions and profit sharing received by N.I. that were generated by Bret; (2) Bret's share of the bonuses or profit sharing was 80% of what he generated; and (3) N.I. had no interest in life and health insurance sold by Bret or Marti and no interest in the health insurance book of business bought from Michael's widow. Bret also requested prejudgment interest on all sums found properly due and costs and attorney's fees.

On December 2, 2013, N.I. filed its answer and counterclaim alleging that Bret breached the 2009 Contract by not placing all insurance through N.I.[4] Bret sought to subpoena the records

---

[3] During the course of pre-trial motion practice, the district court concluded that while not expressly pleaded, Bret had asserted a claim for breach of contract in his complaint.

[4] N.I. also filed a third party complaint against Marti Kunz alleging breach of contract. This claim was later dismissed and the parties stipulated that Marti would be added to Bret's complaint as a plaintiff.

of Farmers Alliance, Acuity, and Allied for 2009 through 2012, which N.I. opposed via a motion for a protective order. N.I. also filed a motion for change of venue and a motion to bifurcate the proceedings. The district court denied N.I.'s motions for a protective order and change of venue, but granted the motion to bifurcate. In granting the motion to bifurcate, the district court held that the first bifurcated proceeding would address the merits of the declaratory relief action, *i.e.*, the interpretation of the 2009 Contract, while the second proceeding would address the merits of the breach of contract claims and Bret's accounting claim. On November 20, 2014, N.I. voluntarily dismissed, without prejudice, its counterclaim against Bret and stipulated that it had no interest in life and health insurance sold by Bret.

On December 8 and 9, 2014, the district court held a two day bench trial, and on August 31, 2015, the district court issued its findings of fact, conclusions of law and memorandum decision. Therein, the district court concluded as follows: (1) the 2009 Contract was not integrated and was not intended to be a final expression of their agreement; (2) the parties had a separate individual agreement, which was established by their testimony and course of dealing whereby N.I. paid Bret 50% of the profit sharing received from Gem State; (3) paragraph six of the 2009 Contract was ambiguous and it could not be determined whether the parties had a profit sharing agreement for any insurance company other than Gem State; (4) the term "commission" as used in the 2009 Contract was not defined, and it could not be determined, based upon a review of extrinsic evidence, that it included profit sharing; (5) there was no legally enforceable agreement whereby Bret was entitled to receive profit sharing from N.I. with respect to Acuity, Farmers Alliance, or Allied; and (6) the payments made by N.I. to Bret, which the Kunzes allege were profit sharing payments, were actually gratuitous bonuses.

The Kunzes appeal.

### III. ISSUES ON APPEAL

1. Whether the district court erred in interpreting the term "commission."
2. Whether the district court erred in interpreting the phrase "other functions."
3. Whether the district court erred in characterizing certain payments as "gratuitous bonuses."
4. Whether the district court erred in concluding that the profit sharing payments related to the Gem State implied in fact contract should be split 50/50.
5. Whether the district court erred in failing to construe the 2009 Contract against the drafter, N.I.
6. Whether the district court's judgment was erroneous because it failed to acknowledge that the Kunzes prevailed in part.

6

**7.** Whether either party is entitled to attorney's fees on appeal.

## IV. STANDARD OF REVIEW

When considering an appeal of a trial court's decision from a bench trial, this Court's review is limited as follows:

> [W]hether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. A district court's findings of fact in a bench trial will be liberally construed on appeal in favor of the judgment entered, in view of the district court's role as trier of fact. It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses. We will not substitute our view of the facts for the view of the district court. Instead, where findings of fact are based on substantial evidence, even if the evidence is conflicting, those findings will not be overturned on appeal. We exercise free review over the lower court's conclusions of law, however, to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found.

*Pocatello Hosp., LLC v. Quail Ridge Med. Investor, LLC*, 156 Idaho 709, 714, 330 P.3d 1067, 1072 (2014) (quoting *Clayson v. Zebe*, 153 Idaho 228, 232, 280 P.3d 731, 735 (2012)).

"Whether a contract is ambiguous is a question of law over which we exercise free review." *Swanson v. Beco Constr. Co., Inc.*, 145 Idaho 59, 62, 175 P.3d 748, 751 (2007) (citing *Howard v. Perry*, 141 Idaho 139, 142, 106 P.3d 465, 468 (2005)).

## V. ANALYSIS

### 1. The district court did not err in interpreting the term "commission."

The Kunzes argue that the district court erred in interpreting the term "commission" by relying on Bryan's subjective, undisclosed intent—that the payments were bonuses, not profit sharing payments—and failed to attribute more significance to the parties' course of conduct. Specifically, the Kunzes argue that in interpreting the term "commission" narrowly, the district court ignored the following: (1) that N.I. made profit sharing payments to Bret; and (2) that at the time the 2009 Contract was signed, Bryan mentioned that N.I. had a good profit sharing arrangement with Michael. Citing *Johnson Cattle Co. v. Idaho First Nat'l Bank*, 110 Idaho 604, 607, 716 P.2d 1376, 1379 (Ct. App. 1986), the Kunzes submit that Bryan's statement, which was made contemporaneous with the signing of the 2009 Contract, is material to the interpretation of the 2009 Contract.

On a somewhat unrelated note, the Kunzes argue that the district court erred in concluding that a profit sharing agreement did not exist for business written with Acuity or

7

Farmers Alliance. The Kunzes argue that the only difference between Gem State and the aforementioned companies is that N.I. had exclusive control over the accounting information for Acuity and Farmers Alliance.

In response, N.I. makes two arguments. First, N.I. argues that the Kunzes' argument fails to consider the fact that the parties' course of conduct is merely one of several factors the district court considered in interpreting the term "commission." Second, N.I. argues that the district court erred in considering extrinsic evidence, *i.e.*, the parties' course of conduct, to conclude that an implied in fact contract existed for Gem State profit sharing. Specifically, N.I. argues that the district court erred in making findings concerning the separate agreement because the legal theory upon which it was based—an implied in fact contract—was not pleaded by the Kunzes. Nonetheless, N.I. recognizes that because the district court ultimately entered judgment in its favor, the error was "probably harmless."

"A contract term is ambiguous when there are two different, reasonable interpretations of the language." *Brown v. Greenheart*, 157 Idaho 156, 167, 335 P.3d 1, 12 (2014) (citing *Swanson v. Beco Constr. Co.*, 145 Idaho 59, 62, 175 P.3d 748, 751 (2007)). In *J.R. Simplot Co. v. Bosen*, this Court explained how a court should interpret an ambiguous contract.

> If the provisions of a contract are ambiguous, the interpretation of those provisions is a question of fact which focuses upon the intent of the parties. *Bream v. Benscoter*, 139 Idaho 364, 79 P.3d 723 (2003). The determination of the parties' intent is to be determined by looking at the contract as a whole, the language used in the document, the circumstances under which it was made, the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings. *Ramco v. H–K Contractors, Inc.*, 118 Idaho 108, 794 P.2d 1381 (1990); *International Eng'g Co., Inc. v. Daum Indus., Inc.*, 102 Idaho 363, 630 P.2d 155 (1981). A party's subjective, undisclosed intent is immaterial to the interpretation of a contract.

144 Idaho 611, 614, 167 P.3d 748, 751 (2006).

The term "commission" is ambiguous because it is not defined by the 2009 Contract and has multiple reasonable definitions in the insurance industry including monthly commissions and annual contingent commissions. The parties both proffered a reasonable definition that, unsurprisingly, best suited their respective positions. To resolve the ambiguity, the district correctly applied the factors from *Bosen*. The district court examined the 2009 Contract as a whole and the language used therein and noted that the term "commission" was used multiple

times, including in the context of monthly payments with no attempt to import different meanings between each use of the term. Further, the district court highlighted the fact that Bret's 2009 Contract and his 1996 Contract were nearly identical, and Bret admitted that he did not expect to receive profit sharing under his 1996 Contract. As for the circumstances surrounding the execution of the 2009 Contract, the district court noted that Bret testified that he entered the 2009 Contract with the expectation that an ownership provision would be included; therefore, the district court reasoned that it would be expected that had profit sharing been contemplated by the parties, it would be expressly provided in the 2009 Contract. Regarding the parties' course of conduct, the district court found that both sides agreed that commissions were paid monthly and profit sharing was paid annually. Accordingly, because there was no attempt to distinguish "commission" in paragraph six (in the context of monthly payments) from "commission" in paragraph seven (addressing the compensation percentage split), the district court found that both uses of the term must be limited to the monthly commission payments, not annual profit sharing payments. In sum, substantial and competent evidence supports the district court's finding that the term "commission," as used in the 2009 Contract, is limited to monthly commissions and does not include profit sharing.

The Kunzes' arguments are unpersuasive. Bryan's comments about profit sharing checks, and the fact that N.I.'s payments to Bret were labeled "profit sharing" are not dispositive. The Kunzes are correct in asserting that *Johnson Cattle Co., Inc.* stands for the proposition that, in interpreting an ambiguous contract, evidence of an oral agreement reached prior to the signing of a contract may be admissible to resolve the ambiguity. 110 Idaho 604, 607, 716 P.2d 1376, 1379 (Ct. App. 1986). In *Johnson Cattle Co.*, however, the oral agreement was just that: an agreement. *Id.* A bank manager purportedly agreed to finance a loan if the opposing party was willing to relinquish its secured position. *Id.* Here, however, the Kunzes rely merely upon a statement made by Bryan and fail to present evidence that the parties had reached an oral agreement regarding profit sharing. Bryan's statements are of limited value to the Kunzes' position because the Kunzes failed to present evidence that an oral agreement had been reached.

The Kunzes' somewhat unrelated argument—that the district court erred in concluding that an individual profit sharing agreement did not exist for business written for Acuity or Farmers Alliance—is meritless. The Kunzes argue that the only difference between Gem State and the aforementioned companies is that N.I. had exclusive control over the accounting

information for Acuity and Farmers Alliance. The Kunzes' argument ignores the basis upon which the district court concluded a side agreement existed, *i.e.*, N.I. and Bret, through an exchange of emails and corresponding payments, reached an implied in fact contract to split Gem State profit sharing 50/50. Whether or not N.I. had exclusive control over certain accounting information is irrelevant.

Under Idaho Appellate Rule 11(g), a respondent must file a cross-appeal if it seeks affirmative relief by way of reversal, vacation, or modification of the judgment. I.A.R. 11(g). This Court has clarified, in *Walker v. Shoshone Cnty.*, that a cross-appeal is not required when a respondent "merely seeks to sustain a judgment for reasons presented at trial which were not relied upon by the trial judge but should have been." 112 Idaho 991, 993, 739 P.2d 290, 292 (1987). Here, N.I. is seeking the vacation or reversal of the district court's conclusion that an implied in fact contract existed for Gem State's profit sharing. We will not consider N.I.'s claim because N.I. failed to file a cross-appeal.[5]

### 2. The district court did not err in interpreting the phrase "other functions."

The Kunzes argue that the phrase "other functions" provides an alternative basis for their entitlement to profit sharing payments and that the district court erred by failing to interpret it as such. The Kunzes note that while the district court concluded that the phrase "other functions" was ambiguous, it failed to resolve the ambiguity. Thus, the Kunzes reason, the phrase was rendered "meaningless surplusage." The Kunzes argue that, in construing a contract, an interpretation should be avoided that would render meaningless any particular provision of the contract.

N.I. argues that the Kunzes' assertion is meritless. N.I. notes that the district court specifically addressed the phrase and concluded that it had "no place within this document other than to notify the reader and the parties that there are other unexpressed functions and individual agreements not discussed and/or outlined in the body of this document."

The Kunzes premise their argument on a theory of contract interpretation advanced by Justice Schroeder in his dissent in *Star Phoenix Min. Co. v. Hecla Min. Co.*, 130 Idaho 223, 233, 939 P.2d 542, 552 (1996) (Schroeder, J., dissenting). Justice Schroeder quoted a Maine court,

---

[5] For the same reason, we will not consider N.I.'s argument that the district court erred in concluding that Idaho Rule of Civil Procedure 41(b) does not apply to declaratory judgment actions.

stating: "In construing a contract, an interpretation should be avoided that would render meaningless any particular provision in the contract." *Id.* While Justice Schroeder's approach does not appear to be adopted as precedent by this Court, it does mirror a well-recognized approach to statutory interpretation: "The Supreme Court will not construe a statute in a way which makes mere surplusage of provisions included therein." *Sweitzer v. Dean*, 118 Idaho 568, 572, 798 P.2d 27, 31 (1990) (citing *Hartley v. Miller-Stephan*, 107 Idaho 688, 692 P.2d 332 (1984)).

The Kunzes' argument is unpersuasive. Considering the *Bosen* factors, there is no indication that the phrase "other functions" includes profit sharing. For example, Bret's 1996 Contract includes the phrase "other functions"; yet, Bret did not expect profit sharing under that contract. As for the purpose of the phrase, it notifies a reader that unexpressed functions, which are the responsibility of N.I., exist. Further, considering the 2009 Contract as a whole, there is no mention of profit sharing. It is unreasonable to assume that "other functions" would somehow include profit sharing.

### 3. The district court did not err when it characterized certain payments as "gratuitous bonuses."

The Kunzes argue that the district court erred in concluding that certain payments from N.I., which related to business with Acuity, Farmers Alliance, and Allied, were "gratuitous bonuses." The Kunzes assert that the only explanation for the district court's conclusion is that it impermissibly considered Bryan's subjective, undisclosed intent that the payments were bonuses.

N.I. does not dispute the Kunzes' argument that a party's subjective, undisclosed intent is immaterial to the interpretation of a contract. Indeed, N.I. argues that the objective law of contract should be applied when a contract is unambiguous. However, N.I. asserts that the Kunzes' argument fails because they attempt to apply the objective law of contract interpretation to extrinsic evidence, *i.e.*, the checks labeled "profit sharing." N.I. argues that there is no authority supporting such an application. Separately, N.I. asserts that the Kunzes overlook the reasonable approach by which the district court reached its conclusion.

The Kunzes' argument is unpersuasive. Inexplicably, they assert that the district court must have relied on Bryan's subjective, undisclosed intent in characterizing certain payments as gratuitous bonuses. Such an assertion ignores the rational process by which the district court reached its conclusion. The district court determined that the term "commission" in the 2009

11

Contract was ambiguous, applied the *Bosen* factors, and concluded that the meaning of "commission" was limited to monthly commissions. Thus, the district court held that the 2009 Contract did not provide for profit sharing. As discussed above, this conclusion was correct.

Digressing for a moment from the substantive issues, we feel compelled to acknowledge that this result is not especially equitable to the Kunzes. N.I. was less than transparent with Bret regarding its position on profit sharing. Indeed, N.I. allowed Bret to operate under the 2009 Contract with the understanding that he would receive profit sharing, but did not correct Bret until litigation commenced. Despite our discomfort with the scenario, there is no legal basis upon which to find that the parties had a legally enforceable contract regarding profit sharing. "[C]ourts do not possess the roving power to rewrite contracts in order to make them more equitable." *Kantor v. Kantor*, 160 Idaho 810, 820, 379 P.3d 1080, 1090 (2016) (quoting *Losee v. Idaho Co.*, 148 Idaho 219, 223, 220 P.3d 575, 579 (2009)). Furthermore, while "[e]quity may intervene to change the terms of a contract if the court finds unconscionable conduct serious enough to justify its interference," the harsh enforcement of unwise provisions is not proper justification. *Id.* Despite our misgivings with the result, we affirm the district court's decision.

**4. The district court did not err in concluding that profit sharing payments for Gem State should be split 50/50.**

The Kunzes assert that the district court erred by importing the 50/50 ownership split from the 2009 Contract to the Gem State implied in fact contract instead of the 80/20 commission split, which was also in the 2009 Contract. They argue that this Court should "set aside the conclusion that profit sharing payments are limited to 50/50 where nothing in the [2009 Contract] supports that."

N.I. asserts that the district court's conclusion that the Gem State profit sharing should be split 50/50 was based on the parties' course of conduct. Further, N.I. argues that the Kunzes' argument that the profit sharing split should be 80/20 contradicts the district court's conclusion that the term "commission" does not include profit sharing.

The Kunzes' argument is unpersuasive. The crux of the Kunzes' argument is that the district court erred by importing the incorrect percentage split from the 2009 Contract to the implied in fact contract. This position is undermined by two of the district court's findings. First, the district court found that the profit sharing split for the implied in fact contract stemmed from the parties' course of conduct. Accordingly, the Kunzes' assumption that the 2009 Contract was

12

the source of the profit sharing split for the implied in fact contract is incorrect. Second, the district court found that the 2009 Contract did not provide for profit sharing. Thus, it would be nonsensical for the 2009 Contract to provide the profit sharing percentage split for the implied in fact contract.

**5.      The district court did not err by failing to construe the 2009 Contract against the drafter, N.I.**

The Kunzes argue that the district court erred by failing to apply the general rule that written documents, if ambiguous, should be construed against the drafter. They assert that the district court found that there was little evidence demonstrating that a discussion occurred regarding profit sharing, yet failed to interpret the 2009 Contract against N.I., the drafter.

In *Sinclair Mktg., Inc. v. Siepert*, this Court provided as follows: "If the factfinder is unable to determine the intentions of the parties from the factual evidence, then the ambiguity should be resolved against the drafter of the contract as a last resort." 107 Idaho 1000, 1005, 695 P.2d 385, 390, n.5 (1985). This approach is confirmed by Idaho Jury Instruction 6.08.3, which states:

> Where there is ambiguous language in a contract, and where the true intent of the parties cannot be ascertained by any other evidence, the ambiguity can be resolved by interpreting the contract against the party who drafted the contract or provided the ambiguous language.

I.D.J.I. 6.08.3.

The Kunzes' argument is unavailing because the ambiguities in the 2009 Contract were resolved by applying the *Bosen* factors. Accordingly, it is unnecessary to interpret the 2009 Contract against the drafter, N.I., because such an approach is only employed when the intent of the parties cannot be ascertained by any other evidence. *Sinclair Mktg., Inc.*, 107 Idaho at 1005, 695 P.2d at 390, n.5.

**6.      The district court did not err by failing to note in its judgment that the Kunzes prevailed in part.**

The Kunzes emphasize that, before trial, N.I. stipulated that it had no interest in life or health insurance sold by Bret or his wife, and no interest in the health insurance book of business that they purchased from Michael's widow. The Kunzes argue that the district court erred by failing to include this stipulation into its judgment. They assert that the district court's omission is noteworthy because it may have an impact on attorney's fees awarded below. Accordingly,

13

they ask this Court to order that any final judgment from the district court must incorporate N.I.'s stipulation.

N.I. argues that the Kunzes waived this issue because they did not raise it below and because they failed to provide legal authority supporting the assertion. Further, N.I. argues that the Kunzes' position on this issue is inconsistent with their position at a January 21, 2016 hearing, in which Bret objected to "any amendment." Lastly, N.I. argues that the Kunzes' argument is inconsistent with Idaho Rule of Civil Procedure 54(b) because after this appeal, the district court will resume jurisdiction and enter judgment on all remaining claims.

Idaho Rule of Civil Procedure 54(b) addresses partial judgment upon multiple claims or involving multiple parties. I.R.C.P. 54(b). Subsection one of the rule provides as follows:

> When an action presents more than one claim for relief, whether as a claim, counterclaim, crossclaim, or third-party claim . . . the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any judgment, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities. In the event the trial court determines that a partial judgment should be certified as final under this Rule 54(b), the court must execute a certificate which must immediately follow the court's signature on the partial judgment and be in substantially the form found in Appendix B.

*Id.*

The district court still has the opportunity to address the remaining claims and issue a final judgment. Further, the district court will have the opportunity to consider the fact that N.I. stipulated to part of the Kunzes' complaint before ruling on costs and attorney's fees. Therefore, the district court did not err by failing to note that the Kunzes prevailed in part.

**7.    Neither party is entitled to attorney's fees on appeal.**

In their opening brief, the Kunzes' argument for attorney's fees on appeal consists, in its entirety, as follows: "Appellants should be awarded their attorney's fees on appeal."

N.I. argues that it is entitled to attorney's fees and costs on appeal on multiple grounds. First, N.I. asserts that it is entitled to costs under Idaho Code section 10-1210. Next, N.I. argues that it should be awarded attorney's fees as the prevailing party under Idaho Code section 12-

120(1) and (3). Lastly, N.I. asserts that it should be awarded attorney's fees under Idaho Code section 12-121 because the Kunzes' appeal was unreasonable and lacked foundation.

In *Asbury Park, LLC v. Greenbriar Estate Homeowners' Ass'n, Inc.*, this Court reviewed a partial judgment that was certified as final pursuant to Idaho Rule of Civil Procedure 54(b). 152 Idaho 338, 345, 271 P.3d 1194, 1201 (2012). The Court reasoned that it could not determine the prevailing party, nor could it award attorney's fees because the certified judgment did not dispose of all of the parties' claims. *Id.* The Court instructed the district court to "take the issue of attorney fees and costs . . . into consideration when it addresses all fees and costs at the conclusion of the case." *Id.* at 346, 271 P.3d at 1202. Similarly, at this time, we cannot determine a prevailing party, nor can we award attorney's fees on appeal, because the judgment before this Court did not dispose of all the parties' claims; namely, Bret's accounting claim. Nonetheless, we instruct the district court to consider the issue of attorney's fees and costs when it addresses all fees and costs at the conclusion of the case.

## VI. CONCLUSION

We affirm the judgment of the district court. Attorney's fees and costs on appeal are not awarded to either party at this time.

Chief Justice BURDICK, Justices EISMANN, HORTON and BRODY, CONCUR.

15