**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket Nos. 49342 & 49417**

| | | |
|---|---|---|
| **THOMAS MATTHEW DORSEY, an individual,** | ) | |
| | ) | |
| **Plaintiff-Counterdefendant-Appellant,** | ) | |
| | ) | |
| **and** | ) | **Boise, December 2022 Term** |
| | ) | |
| **SUNNYSLOPE LAND & LIVESTOCK, INC.,** an Idaho corporation, | ) | **Opinion Filed: August 30, 2023** |
| | ) | |
| **Plaintiff-Appellant,** | ) | **Melanie Gagnepain, Clerk** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THOMAS E. DORSEY, an individual,** | ) | |
| | ) | |
| **Defendant-Counterclaimant-Cross Defendant-Respondent,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DORSEY ORGANICS, LLC, an Idaho limited liability company,** | ) | |
| | ) | |
| **Defendant-Counterclaimant-Cross Claimant-Respondent,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **DORSEY FARMS, INC., an Idaho corporation; THE DORSEY LIVING TRUST, an Idaho trust,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **THOMAS MATTHEW DORSEY, an individual,** | ) | |
| | ) | |
| **Plaintiff-Counterdefendant-Respondent,** | ) | |
| | ) | |
| **and** | ) | |

SUNNYSLOPE LAND & LIVESTOCK, INC., )
an Idaho corporation, )

    Plaintiff-Respondent, )

v. )

THOMAS E. DORSEY, an individual, )

    Defendant-Counterclaimant-
    Cross Defendant-Appellant, )

and )

DORSEY ORGANICS, LLC, an Idaho limited )
liability company, )

    Defendant-Counterclaimant-
    Cross Claimant, )

and )

DORSEY FARMS, INC., an Idaho )
corporation; THE DORSEY LIVING TRUST, )
an Idaho trust, )

    Defendants. )

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Thomas W. Whitney, District Judge.

The judgment of the district court is vacated. The case is remanded for further proceedings.

Arkoosh Law Offices, Boise, for Appellants/Respondents, Thomas Matthew Dorsey and Sunnyslope Land & Livestock, Inc. C. Tom Arkoosh argued.

Dinius Law, Nampa, for Respondent/Cross-Appellant, Thomas Edwin Dorsey. Kevin Dinius argued.

Kiiha and Associates PLLC, Nampa, for Respondent, Dorsey Organics, LLC. Jay Kiiha argued.

———————————

STEGNER, Justice.

In 2019, Matt Dorsey brought an action against his father, Tom Dorsey, seeking formal accounting, dissolution, and winding up of their joint dairy operation, Dorsey Organics, LLC. The district court appointed a Special Master to preside over the proceedings. The Special Master subsequently recommended to the district court that it grant partial summary judgment to Tom Dorsey on Counts Four (breach of contract) and Five (constructive fraud) of Matt Dorsey's complaint. Without receiving a definitive ruling from the district court on the recommendations regarding the motions for summary judgment, the case then proceeded to a four-day hearing presided over by the Special Master, which resulted in the Special Master making Proposed Findings of Fact and Conclusions of Law. The district court adopted, with almost no changes, the Special Master's Proposed Findings of Fact and Conclusions of Law, which relied upon the accounting of Tom Dorsey's expert and rejected the opinions of Matt Dorsey's expert. The district court then entered a judgment incorporating, with few changes, the Special Master's Proposed Findings of Fact and Conclusions of Law. The district court also denied Tom Dorsey's request for attorney fees under Idaho Code section 12-120(3).

Matt Dorsey appeals, raising multiple issues, including: (1) whether the district court failed to properly review the evidence before accepting the findings of the Special Master; (2) whether a court may override the terms of a contract even though the contract's terms arguably produce an inequitable result; (3) whether Tom Dorsey wrongfully dissociated from Dorsey Organics prior to its dissolution and the winding up of its affairs; and (4) whether summary judgment was properly granted on Counts Four and Five of the Third Amended Complaint. Tom Dorsey also appeals the district court's denial of his request for attorney fees. This Court consolidated the two appeals.

For the reasons discussed below, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Prior to this lawsuit, Thomas E. Dorsey ("Tom") and his son, Thomas Matthew Dorsey ("Matt"), owned and managed separate, fully operational, dairy farms in Canyon County.[1] Tom operated his dairy through his company, Dorsey Farms, Inc. ("Dorsey Farms"). The Dorsey Living Trust owned the real property on which Tom's dairy was located. Tom and his wife, Dana, were

---

[1] Because the two principal parties share the surname Dorsey, Tom Dorsey and Matt Dorsey will be referred to by their first names. We will also refer to Tom's and Matt's wives (Dana and Krista, respectively) by their first names for the same reason. No disrespect is intended by doing so.

3

the trustees of The Dorsey Living Trust. Matt and his wife, Krista, conducted their dairy operations through their company, Sunnyslope Land & Livestock, Inc. ("Sunnyslope").

In 2014, Tom began to explore options for his retirement and asked Matt to come up with a plan for Matt to purchase Dorsey Farms, so Tom could retire. Matt retained the consulting and financial assistance of Lance Fenton, a Certified Public Accountant, with the accounting firm Cooper Norman, which specializes in accounting for dairies. The father and son held several meetings to discuss the best way to meet their mutual goals of transferring the real estate, ownership of the farming and dairy operations, as well as shifting management responsibility of Dorsey Farms from Tom to Matt. Tom and Dorsey Farms had outstanding bank loans that would need to be paid before Tom and Dana would have enough money to retire and complete the transfer of Dorsey Farms to Matt.

The parties determined that the best way to achieve these goals would be to turn Dorsey Farms into an organic dairy. Because Tom had been operating a conventional dairy, the process to transition both his farm and his cows to a certified organic dairy would take several years. No written agreements describing the intent or purported agreements of the parties were prepared at that time. Discussions eventually faltered; however, Matt continued to explore the possibility of converting Dorsey Farms into an organic dairy. This process included not only acquiring and freshening[2] new cows, but also converting and certifying the existing farmland to produce organic-qualified crops.

The following year, the parties took some steps to convert Dorsey Farms into an organic dairy. This included both Tom and Matt acquiring organic feed, Tom preparing some of the fields that he farmed to be certified for raising organic crops, and Tom acquiring additional heifers to be freshened into organic cows. In April 2016, Matt organized Dorsey Organics, LLC ("Dorsey Organics"), with the knowledge and approval of Tom. There was no operating agreement in place at this time. However, Tom was aware that Matt had caused Dorsey Organics to be organized and gave his permission for Matt to begin operating the new company, with the assumption that Tom would also be a participating, minority member. Shortly thereafter, Matt entered into a supply

---

[2] As described in the Special Master's Final Report, "'[f]reshening' is the process of breeding a heifer as soon as it is old enough, then caring for the animal through the birth of its first calf when it will begin producing milk. Once the animal drops a calf and begins producing milk, she is deemed 'freshened.' She is no longer a 'heifer,' but is a cow, ready to join a dairy's production herd."

4

agreement on behalf of Dorsey Organics with Sorrento Lactalis[3] ("Sorrento") to begin supplying it with organic milk produced by Dorsey Organics.

Also in the spring of 2016, Tom sold his conventional dairy herd, and, with those proceeds, Matt purchased ninety head of organic dairy cows for Dorsey Organics. Tom's conventional dairy herd had been previously encumbered with a loan from Columbia Bank. This existing encumbrance attached to the new organic herd. Matt was aware of the bank's collateral interest in the new herd. Matt also independently purchased fifty-five head of organic dairy cows. Additional heifers were purchased to freshen, with Tom owning roughly 60% and Matt owning roughly 40% of the newly acquired heifers. These heifers were to be kept out of Dorsey Organics prior to freshening. Instead, each party was to bear the cost of feed and care until the freshened cows were transferred to Dorsey Organics' operation.

At this time, Tom verbally agreed to lease Dorsey Farms' dairy facility to Matt, and the parties discussed a plan by which Tom would formally lease Dorsey *Farms* to Dorsey *Organics*. Then, once Tom and Dana were ready to retire, they would sell the real property to Matt and Krista. Yet again, the plan was not reduced to writing. Matt claimed before the Special Master, and again on appeal, that in January 2017, the parties reached a final agreement for Matt to acquire Tom's farming interests and dairy facility. This purported agreement was reduced to writing and has been referred to as "Tom's Option." However, the parties never signed Tom's Option. "Matt contends that Tom said his signature was not needed, as his word was his bond and if he said he would do something, he would do it." Tom's Option provided, in part, that ownership of Dorsey Organics would be distributed with 81.0% to Matt and 19.0% to Tom and that Matt and Tom would be compensated at $35 per hour for work performed for Dorsey Organics.

In February 2017, the parties finally executed a written operating agreement for Dorsey Organics ("the Operating Agreement"). The Operating Agreement was backdated to January 1, 2016, "to cover the entire period from the time the parties actually began operations under the limited liability company." However, a few months later, in the summer of 2017, the parties were unable to agree to the terms of Matt's acquisition of Tom's dairy facility. The primary stumbling block for Tom and Matt moving forward with their ultimate plan was the purchase price for the sale of Dorsey Farms to Matt. The appraised value of Tom's real property came in lower

---

[3] Sorrento Lactalis is an international "dairy company" with branches in several countries. *Our History*, LACTALIS: AM. GRP., https://lactalisamericangroup.com/history/ (last visited August 14, 2023).

than Tom expected, and he was unwilling to sell to Matt based on the price arrived at by the appraiser. Matt was not willing to pay anything more than the appraised value of the property. The lack of a written agreement between Tom and Matt was problematic because Sorrento required Dorsey Organics to have a formal, written lease for a dairy facility for Sorrento to continue to contract with Dorsey Organics.

Throughout the summer of 2017, Matt and Tom continued to discuss the sale of Tom's real estate, but the terms of an agreement were never finalized or reduced to a writing. Tensions continued to escalate regarding the transition. The strain apparently came to a head in 2018 when Tom gave Matt a written demand which read: "PAY DORSEY FARMS $541000.00 [sic] ON CATTLE OR CATTLE WILL BE REMOVED AND I WILL NO LONGER BE PART OF DORSEY ORGANIC [sic][.]" (Capitalization in original.) Neither Matt nor Dorsey Organics paid Tom the $541,000 he demanded. Unable to reach a deal with Tom to purchase Dorsey Farms or to achieve a long-term agreement with Sorrento, Matt arranged for the sale of the entire herd of organic cows in March 2018. Matt claims that this sale required the dissolution and winding up of Dorsey Organics, a process in which Tom purportedly refused to participate. The sale of the organic herd precipitated this litigation.

Matt filed a complaint against Tom and Dorsey Organics in August 2019, alleging that Tom had failed to cooperate in the winding up of Dorsey Organics despite the Operating Agreement's requirement to do so. Matt is the principal plaintiff in this case, but his farming operation, Sunnyslope, is also a named plaintiff. In addition to Tom, other defendants include Tom and Dana's family trust and their farming operation, Dorsey Farms. Dorsey Organics, the LLC created by Matt and Tom, is also listed as a separate defendant.

Matt amended his complaint several times. By the time of the hearing before the Special Master, Matt had asserted claims against Tom and the other defendants for:

1) Accounting and dissolution of Dorsey Organics;
2) Breach of contract against Tom for failing to comply with the winding-up agreement;
3) Breach of contract against Tom for breaching the Operating Agreement of Dorsey Organics;
4) Breach of contract against Tom, Dana, and their trust for their refusal to sell their real property (*i.e.*, Dorsey Farms);

6

5) Constructive fraud and breach of fiduciary duty against Tom for failing to sell Dorsey Farms after saying he would;

6) Wrongful dissociation against Tom;

7) Breaches of fiduciary duty and the duty of loyalty against Tom by Matt, "alleging that Tom Dorsey owed a 'fiduciary duty and duty of loyalty' to Matt Dorsey as the managing member of Dorsey Organics";

8) A judgment declaring that Matt acted pursuant to Idaho Code section 10-1201 as a managing member of Dorsey Organics;

9) Breach of contract and non-payment of goods by Sunnyslope against Dorsey Organics for agricultural commodities sold and delivered; and

10) Attorney fees under Idaho Code sections 10-1210, 12-120, and 12-131.[4]

In response, Tom generally denied the allegations Matt brought in his amended complaint but also brought six counterclaims, as follows:

1) Damages for Matt's breach of the Dorsey Organics' Operating Agreement;

2) Damages for Matt's breach of the implied covenant of good faith and fair dealing;

3) Damages for Matt's breach of fiduciary duty;

4) Damages for Matt's conversion;

5) Partition of a parcel alleged to be jointly owned by Tom and Matt; and

6) Declaration that Matt's withdrawals of Dorsey Organics' capital violated Idaho Code sections 30-25-405 and 30-25-406.

Given the complexities of the case and the need for a detailed and specialized accounting to wind up the affairs of Dorsey Organics, the district court appointed D. Duff McKee, a retired Idaho district judge, as special master ("the Special Master"). The Special Master first heard arguments on Tom's motion for partial summary judgment in August 2020 involving Matt's fourth and fifth causes of action—whether Tom breached a contract for the sale of real property and, in so doing, whether he committed constructive fraud. The Special Master recommended that the district court grant partial summary judgment in Tom's favor on both counts.

---

[4] Matt requested attorney fees pursuant to Idaho Code section 12-131. However, section 12-131 does not exist in Title 12. As a result, it appears that Matt intended to request attorney fees under a general provision provided in Idaho Code section 12-121.

While the record does not include any analysis by the district court regarding the Special Master's recommendations involving partial summary judgment, the district court's Conclusions of Law referred to the summary judgment issues as follows:

> 8. Summary judgment having been granted [by the Special Master] to the defendants on the issue of the breach of contract on sale of real estate, and for any claim of fraud thereunder, it was not a breach of any agreement nor was it wrongful conduct for Tom to fail to agree to enter into a real estate contract [sic] any person or entity.
>
> . . . .
>
> 10. The plaintiffs have failed to prove that any defendant owed a fiduciary duty to any plaintiff. Tom Dorsey did not owe any fiduciary duty to anyone under the operating agreement of Dorsey Organics.

The district court's Judgment also dismissed "Plaintiffs' Fourth and Fifth Claims for Relief in the Third Amended Complaint" with prejudice; however, it did so without any substantive analysis.

Following a four-day hearing, the Special Master issued his Final Report With Findings of Fact, Conclusions of Law and Recommendations for Entry of Judgment, ("the Special Master's Final Report"), in which the Special Master recommended a resolution of the remaining claims. Much of the Special Master's Proposed Findings of Fact and Conclusions of Law, and the nearly identical findings which were adopted by the district court, concern substantive variations in the accounting approaches of Tom's and Matt's expert accountants (Trevor Gunstream and Lance Fenton, respectively) involving dissolution and winding up of Dorsey Organics. The Special Master relied almost exclusively on the accounting opinions and methodology of Gunstream. The district court concluded that the Special Master's Proposed Findings of Fact and Conclusions of Law were not clearly erroneous and adopted virtually all of the Proposed Findings of Fact and Conclusions of Law of the Special Master, with only one alteration regarding the sale of the Holton Place, after Tom's counterclaim for partition had apparently been dismissed.[5] As a result, the district court ordered Tom and Matt to pay their respective debts to Dorsey Organics, Dorsey Organics to settle its liabilities, and for the remaining claims to be dismissed. The district court also denied Tom's request for attorney fees. Matt and Tom each appealed.

---

[5] The Holton Place is a parcel of real property located in Canyon County that was owned equally by Tom and Matt and was farmed exclusively by Matt. The parcel was sold by stipulation of Tom and Matt during the litigation; however, the parties never provided the stipulation to the district court. Accordingly, the district court considered Tom's counterclaim to partition the Holton Place to be dismissed without prejudice.

## II. ISSUES ON APPEAL

1. Whether the district court erred in its method of adopting the Special Master's Proposed Findings of Fact and Conclusions of Law.

2. Whether the district court erred by failing to follow the terms of the Operating Agreement and Tom's Option.

3. Whether the district court erred when it required Matt to prove fraud regarding Tom's proffered weight tickets.

4. Whether the district court erred when it concluded that Tom was entitled to credit for half of the crops grown on the Holton Place.

5. Whether the district court erred when it concluded that Dorsey Farms did not owe additional money to Sunnyslope for goods sold and delivered.

6. Whether the district court erred when it applied Idaho Code section 30-25-405 to its analysis of Matt's draws from Dorsey Organics.

7. Whether the district court erred when it concluded that Tom had not wrongfully dissociated from Dorsey Organics.

8. Whether the district court erred when it denied attorney fees to Tom.

9. Whether either party is entitled to attorney fees on appeal.

## III. STANDARDS OF REVIEW

The district court may appoint a special master in any general adjudication and shall specify the special master's powers and duties in the order of reference. Subcases referred to a special master are governed by the [Idaho Rules of Civil Procedure] and the Idaho Rules of Evidence . . . .

The special master's findings which the court adopts are considered to be the findings of the court. The special master's conclusions of law are not binding upon the district court, although they are expected to be persuasive. To the degree that the district court adopts the special master's conclusions of law, they are also the conclusions of the court.

The question of compliance with the rules of procedure and evidence is one of law. This Court freely reviews conclusions of law.

*In re: SRBA Case No. 39576 Subcase Nos. 65-23531 and 65-23532*, 163 Idaho 144, 149, 408 P.3d 899, 904 (2017) (internal citation omitted).

The district court [is] required to accept the master's findings of fact unless they [are] clearly erroneous. . . . A trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous. On appeal, we do not judge the credibility of the witnesses or the weight of the evidence. We only examine the record to determine if the factual findings are supported by evidence that a reasonable trier of fact would accept and rely upon in determining whether a disputed issue of fact has been proved.

9

*City of Pocatello v. Idaho*, 152 Idaho 830, 840, 275 P.3d 845, 855 (2012) (internal citations omitted).

> In an appeal from an order granting summary judgment, this Court's standard of review is the same as the standard used by the district court in passing upon a motion for summary judgment. *Kolln v. Saint Luke's Reg'l Med. Ctr.*, 130 Idaho 323, 327, 940 P.2d 1142, 1146 (1997). Summary judgment is appropriate if the pleadings, affidavits, and discovery documents on file with the court, read in a light most favorable to the nonmoving party, demonstrate no material issue of fact such that the moving party is entitled to a judgment as a matter of law. *See* I.R.C.P. 56(c); *Badell v. Beeks*, 115 Idaho 101, 102, 765 P.2d 126, 127 (1988). If the evidence reveals no genuine issue as to any material fact, then all that remains is a question of law over which this Court exercises free review. *Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 175, 923 P.2d 416, 420 (1996).

*Partout v. Harper*, 145 Idaho 683, 685–86, 183 P.3d 771, 773–74 (2008).

> This [C]ourt uses an abuse of discretion standard to review a district court's decision to award attorney's fees. Yet, "when an award of attorney fees depends on the interpretation of a statute, the standard of review for statutory interpretation applies," which is "a question of law over which this Court exercises free review."

*Knudsen v. J.R. Simplot Co.*, 168 Idaho 256, 265, 483 P.3d 313, 322 (2021) (internal citations omitted).

## IV. ANALYSIS

### A. The district court erred in its method of adopting the Special Master's Proposed Findings of Fact and Conclusions of Law.

Matt first challenges the district court's wholesale adoption of the Special Master's Proposed Findings of Fact and Conclusions of Law. Matt argues that the *district court*, not the parties, has the obligation to determine whether any of the Special Master's Proposed Factual Findings were clearly erroneous. Tom argues the opposite—that "the district court's review is focused on the findings of fact the *objecting party* identifies and/or raises[.]" (Italics added.)

The district court explained that it interpreted Idaho Rule of Civil Procedure 53 to impose an obligation to adopt the Special Master's Proposed Findings of Fact unless those findings were clearly erroneous. However, the district court continued:

> So[,] what I did not do was re-read the entire transcript of the four-day proceedings and look for errors by the special master. And I didn't do that for a couple of reasons. One is that generally in our law, in Idaho law, reviewing courts don't simply take it upon itself, the court—the reviewing court doesn't take it upon itself to review the record, reconsider the record as a whole searching for error by a lower court or in this case searching for error by the special master. So[,] I did not do that. I did not reread the transcript in an effort to myself find what I think might

have been clearly erroneous by the special master. And I did not for that reason. I do not believe that's the function—that's the basic function of our system of juris prudence [sic] in the State of Idaho.

Additionally, and related and way more importantly, if I were to do that—if I were to say, okay, I see the special master's report, and I will reread it start to finish, or I will read it rather start to finish and re-weigh the evidence on the whole transcripts that I have and look for what I think is clearly erroneous, if I were to do that I would in essence be taking sides. Because here we have one party who has said under the rule I get to object to the special master's findings of fact. And certainly Mr. Arkoosh and Ms. Dresslar have done that on behalf of the plaintiff Matt. So[,] they have decided what on behalf of Matt are they [sic] going to make objections to, and then it's the court's obligation to rule on that.

Mr. Dinius has not done that. Mr. Kiiha has not done that either. But if I were to undertake the task of reviewing the record on my own to decide what I think is clearly erroneous, then I would in essence be deciding for the parties this is the objection I think your lawyer should have made, and I will now grant it. It would be taking sides in the litigation. And so[,] I don't view the rule as requiring or even allowing the district court to do that. Rather, I read the rule taking the entirety of Rule 53(j) as requiring the parties to state their objections and then the court to rule on those objections. And so that is what I have done here. I have considered the objections filed by Mr. Arkoosh and Ms. Dresslar on behalf of Matt, and then I will rule on those objections.

. . . .

But I understand that in any way that I'm adopting the master's findings I understand that they are the court's findings once adopted. I understand that. But, again, in terms of determining what are the findings I think it's only fair to both sides, and I think it's the best thing for the court to do, to layout [sic] exactly what I have done in terms of considering that.

The district court then went on to address Matt's specific objections to the Special Master's Proposed Factual Findings, but it went no further.

We find Matt's argument more persuasive. "The district court may appoint a special master in any general adjudication and shall specify the special master's powers and duties in the order of reference." *United States v. Black Canyon Irrigation Dist.*, 163 Idaho 54, 59, 408 P.3d 52, 57 (2017) (internal citation omitted). "The purpose of a master is to assist the district court in obtaining facts where complicated issues or exceptional conditions require it. The appointment of a master does not displace the district court's role as the ultimate trier of fact." *Seccombe v. Weeks*, 115 Idaho 433, 435, 767 P.2d 276, 278 (Ct. App. 1989), *overruled on other grounds by Rodriguez v. Oakley Valley Stone, Inc.*, 120 Idaho 370, 378, 816 P.2d 326, 334 (1991) (internal citations omitted).

The district court's review of the record requires more demanding scrutiny of the special master's findings than was employed to determine whether the special master's recommendations are supported by substantial and competent evidence.

> The appointment of a master does not displace the district court's role as the ultimate trier of fact. Under I.R.C.P. 53(e)(2), the district court is mandated to accept the master's findings of fact unless clearly erroneous; consequently, the trial court must *independently review the* evidence to determine whether the findings were supported by substantial evidence.

*Seccombe*, 115 Idaho at 435, 767 P.2d at 278 (italics added). The law requires a trial court to conduct a more "careful review" of the record when evaluating the recommendations of a special master because "the trial court must independently review the evidence to determine whether the findings were supported by substantial evidence." *McCray v. Rosenkrance*, 135 Idaho 509, 515, 20 P.3d 693, 699 (2001) (quoting *Seccombe*, 115 Idaho at 435, 767 P.2d at 278) (internal quotation marks omitted).

Idaho Rule of Civil Procedure 53(j) states:

> [T]he court must accept the master's findings of fact unless clearly erroneous. Within 14 days after being served with notice of the filing of the report[,] any party may file and serve on the other parties written objections to the report. Any party may file a motion for action on the report. The court, after hearing, may adopt, modify or reject the report in whole or in part, may receive further evidence, or may resubmit the matter to the master with instructions.

Though the rule does not specify *how* a district court must review the Special Master's findings, other cases have considered similar issues. Both parties here rely on *Rodriguez v. Oakley Valley Stone, Inc.*, 120 Idaho 370, 816 P.2d 326 (1991). In *Oakley Valley,* a special master was appointed and his "findings and conclusions were substantially adopted by the court with some alterations." *Id.* at 374, 816 P.2d at 330. On appeal, Oakley Valley Stone argued that the district court's adoption of the special master's findings and conclusions constituted reversible error because "there was insufficient evidence that the court independently reviewed the record" prior to adopting the special master's report. *Id.* at 378, 816 P.2d at 334. This Court disagreed with Oakley Valley Stone and found the district court had met its obligation "to determine if the findings of fact are clearly erroneous" because the district court had reviewed "the documents, affidavits and other papers" and "heard objections to the findings and made a number of corrections" to the special master's report. *Id.* (internal quotation marks omitted).

This Court affirmed a similar procedure used by a district court for adopting a special master's report in *McCray*. 135 Idaho at 515–16, 20 P.3d at 699–700. There, this Court held that even if the district court did not provide a detailed explanation of its adoptions of the special master's report, its decision would not be overturned if it explained that it had reviewed the record and found the special master's findings to be supported by substantial and competent evidence. *Id.*

At first blush, *McCray* appears to conflate the obligations of the district court in reviewing the report of a special master, as articulated in *Oakley Valley*, with the duties of the district court when it acts in its appellate capacity reviewing a magistrate court's decision. However, *McCray* still requires a district court to "make its own careful review [of the record] to determine if the findings of fact are clearly erroneous[.]" 135 Idaho at 515, 20 P.3d at 699 (internal citation omitted). This procedure comports with the interpretation of the federal counterpart of Idaho Rule of Civil Procedure 53: "The Advisory Committee [for the Federal Rules of Civil Procedure] stated in 2003 that a Rule 53(f) review may be more searching than the review that an appellate court makes of a trial court." 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2612 (3d ed. 2023) (internal quotation marks and citation omitted).

By its own admission, the district court acknowledged that it had not reviewed the transcript of the proceedings before the Special Master. The district court is required to "make its own careful review" of the record to determine whether the recommendations of a special master are clearly erroneous. *McCray*, 135 Idaho at 515, 20 P.3d at 699; *see also Seccombe*, 115 Idaho at 435, 767 P.2d at 278. The district court's review is not limited to the parties' objections to the special master's report. The district court has a heightened obligation to review a special master's report as compared to its review of a magistrate court's findings of fact on an appeal. "The appointment of a master does not displace the district court's role as the ultimate trier of fact." *Seccombe*, 115 Idaho at 435, 767 P.2d at 278. As a result, we evaluate the findings of fact and conclusions of law adopted by the district court.

In this case, the district court erred when it limited its review to the objections filed by the parties. "Because the trial court is the final arbiter of all the issues, the master's report does not stand automatically approved in the absence of an objection. Thus, objections to findings and conclusions of the master are not required to preserve an issue for appeal." *Seccombe*, 115 Idaho at 435, 767 P.2d at 278 (internal citation omitted). We hold that the district court in this case erred in three ways: first, in its failure to meet the heightened obligation when reviewing the record;

13

second, in its conclusion that the Special Master's Proposed Factual Findings were not clearly erroneous; and third, in its wholesale adoption of them.

In this case, the district court appeared to take the role of an appellate court when it said: "[T]he reviewing court doesn't take it upon itself to review the record or re-scrutinize the record, reconsider the record as a whole . . . searching for error by the special master." However, as explained by Wright and Miller and Idaho's jurisprudence, the district court *does not* act as an appellate court when reviewing the record to determine whether the recommendations of a special master are clearly erroneous. 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2612 (3d ed. 2023); *Seccombe,* 115 Idaho at 435, 767 P.2d at 978.

We recognize that the language of Idaho Rule of Civil Procedure 53(f) can be confusing when interpreted in this manner because it requires affirmation of the special master's factual findings unless clearly erroneous—arguably the same standard of review used for appellate review of factual findings. *Compare* I.R.C.P. 52(a)(7) ("Findings of fact . . . must not be set aside unless clearly erroneous."), *with* I.R.C.P. 53(j) ("[T]he court must accept the master's findings of fact unless clearly erroneous."). However, given our jurisprudence, along with guidance from the analogous federal procedure, we draw a distinction between Idaho Rules of Civil Procedure 52 and 53.

A district court's obligation upon review of a special master's recommendations is to conduct an "independent" and "careful review" of the record in addition to objections brought to its attention by counsel. Here, the district court erred when it believed its role to be that of an appellate court. The district court's method of adopting the Special Master's Proposed Findings of Fact and Conclusions of Law was incorrect and inadequate. Nevertheless, we now turn to the additional purported errors made by the district court in its adoption of the Special Master's Proposed Findings of Fact and Conclusions of Law that Matt argues were clearly erroneous. When necessary, this Court may give additional direction to the district court to assist it on remand. *Urrutia v. Blaine County*, 134 Idaho 353, 359, 2 P.3d 738, 744 (2000). In *Urrutia*, this Court found one issue raised on appeal to be dispositive, yet "address[ed] the remainder of the arguments presented . . . for the purpose of providing guidance on remand." *Id.* We find it necessary to do the same here to assist the district court upon remand.

14

**B. The district court erred when it failed to follow the terms of the Operating Agreement and to adequately address Tom's Option.**

In their briefing before this Court, both Matt and Tom make several arguments that can be summarized as contending the district court erred in its interpretation of the Operating Agreement and Tom's Option.[6] The district court couched its adoption of the Special Master's Proposed Findings of Fact and Conclusions of Law in terms of an attempt to follow the Operating Agreement and Tom's Option. However, the district court never analyzed whether the agreements in question were ambiguous or whether the parties intended to be bound by the documents. Further, neither party specifically argues whether the Operating Agreement or Tom's Option are ambiguous.

In order to resolve the dispute between Matt and Tom, we must decide whether these documents are ambiguous. *Kunz v. Nield, Inc.*, 162 Idaho 432, 438–39, 398 P.3d 165, 171–72 (2017). If a contract is unambiguous, *i.e.*, its interpretation is not subject to two different reasonable constructions, its interpretation presents a question of law for the court to enforce. *Id.* A determination of ambiguity is a question of law, while the interpretation of an ambiguous term is a question of fact which must be resolved by the finder of fact. *Id.*

We conclude the district court erred when it failed to first analyze whether the contracts were ambiguous before it engaged in the process of delving into the experts' interpretation of the documents. We exercise free review over this question of law. *Rhead v. Hartford Ins. Co. of the Midwest*, 135 Idaho 446, 448, 19 P.3d 760, 762 (2001). We must make this determination in order to resolve the appeal challenging the district court's analysis of the terms within the contracts. *Kunz*, 162 Idaho at 439, 398 P.3d at 172. Therefore, we will first determine whether the Operating Agreement and Tom's Option are ambiguous.

1.  The Operating Agreement is unambiguous.

Matt argues on appeal that the district court erred when it adopted the accounting methodology of Gunstream because Gunstream's accounting deviated from the express terms of the Operating Agreement. Matt contends that the language of the Operating Agreement is unambiguous, and the district court erred in deviating from its language. Tom argues that the

---

[6] Throughout the briefing, the parties have presented arguments challenging and endorsing the Special Master's Proposed Findings of Fact and Conclusions of Law, as opposed to those made by the district court, even though the district court adopted virtually all the findings of fact and conclusions of law proposed by the Special Master. However, as described above, our standard of review requires us to review the findings of the *district court*, even if the findings are exactly as proposed by the Special Master, because the district court remains the ultimate finder of fact even when a special master has been employed.

15

district court's adoption of Gunstream's methodology was not clearly erroneous because Matt accepted the need for detailed accounting experts when he stipulated to the appointment of a Special Master.

Ambiguity of the Operating Agreement was not briefed on appeal. Instead, the parties dispute the district court's interpretation of the terms within the Operating Agreement. As noted, the district court largely adopted the accounting methodology of Gunstream, Tom's expert accountant. In doing so, the district court explained that it was attempting to "interpret[] [the Operating Agreement] as a whole[,]" rather than adopting the accounting that followed Section IX.4, which details the accounting procedures in the event of a dissolution, and Section II.1.2, which explains how capital contributions are to be calculated. The district court explained that the purpose of this approach was to reach a more equitable result.

"Operating agreements are contracts." *Nelsen v. Nelsen*, 170 Idaho 102, 134, 508 P.3d 301, 333 (2022) (internal citation omitted). A contract "is ambiguous when there are two different, reasonable interpretations of the language." *Id.* (internal quotation marks and citation omitted). "In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense[.]" *Knipe Land Co. v. Robertson*, 151 Idaho 449, 454, 259 P.3d 595, 600 (2011) (internal citation omitted).

The Operating Agreement is unambiguous, and, as a result, the district court should have enforced its terms. In the presence of an operating agreement, neither members nor special masters are permitted to substitute their preferences for the agreed-upon terms in the agreement, nor do "[c]ourts . . . possess the roving power to rewrite contracts in order to make them more equitable." *Shawver v. Huckleberry Estates, LLC*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004) (internal quotation marks and citation omitted). Unfortunately, that is what happened here.

We hold that the district court erred in two respects. First, as discussed above, the district court had an initial obligation to determine whether the Operating Agreement was ambiguous. It failed to undertake that analysis. Without an initial determination that the Operating Agreement is ambiguous, it was improper for the district court to deviate from the terms used within it or to justify its ultimate failure to apply the Operating Agreement. Second, the district court erred when it adopted Gunstream's accounting methodology, which failed to follow Sections IX.4 and II.1.2 of the Operating Agreement.

16

In this case, the district court's adoption of Gunstream's methodology ran counter to the explicit, unambiguous terms of the Operating Agreement. Matt and Tom agreed that they would comply with the specific provisions of the Operating Agreement for the dissolution accounting and procedures involving additional capital contributions. Section IX.4 details the accounting timelines necessary for the dissolution of Dorsey Organics, and Section II.1.2 covers the steps the Members of Dorsey Organics were required to take before being credited with additional capital contributions. When Matt and Tom signed the Operating Agreement, they agreed to its terms and became obligated to comply with its provisions. The district court rejected the plain language of the Operating Agreement when it adopted Gunstream's accounting methodology and, in effect, rewrote the Operating Agreement in what was described as an attempt to achieve a more equitable result. The district court concluded that Gunstream's methodology was preferable to resolve the problems created by inconsistent or nonexistent recordkeeping by Dorsey Organics. However, the district court erred when it failed to follow the plain language of the Operating Agreement. Because the Operating Agreement is unambiguous, we need not analyze the parties' intent; we simply apply the Operating Agreement as written. *Kunz*, 162 Idaho at 439, 398 P.3d at 172.

There are two substantive issues on appeal that involve a plain reading of the Operating Agreement: heifer ownership and startup costs. Each is discussed in turn.

a.  *Heifer Ownership*

The accounting disputes in this case relate primarily to whether Dorsey Organics owned, and was, therefore, financially responsible for, certain heifers prior to their freshening, which would result in a much different cost attributable to Tom and Matt. The district court concluded that there "was [not] an agreement between the parties on how the heifers were to be accounted for[,]" and the different proposals of Tom and Matt resulted in large discrepancies in how each party was treated. In adopting Gunstream's opinions, the district court concluded that "the heifers acquired by the parties should be taken onto the company books at acquisition cost, with care and feeding of the heifer being the responsibility of Dorsey Organics[,]" as opposed to being attributed individually to Tom and Matt with each bearing the cost of care and feeding of their own heifers until those heifers were freshened and then transferred to Dorsey Organics.

Matt and Dorsey Organics argue that this accounting was improper because previous accounting done by Dorsey Organics had treated heifers as the responsibility of Dorsey Organics

17

only *after* their freshening. Section IX.4 of the Operating Agreement requires the dissolution accounting to be made from "the last previous accounting[,]" which occurred in December 2017 during the preparation of Dorsey Organics' tax returns. Matt and Dorsey Organics argue that this "last previous accounting" is the one that should be used for dissolution and winding up affairs, not the new methodology provided by Gunstream. Matt and Dorsey Organics contend that this improper accounting treats Matt's and Tom's respective heifer contributions incorrectly and in Tom's favor. Matt maintains Gunstream's accounting treated the freshening of heifers differently than what was called for in the Operating Agreement. Tom argues in response that it is unreasonable to limit the district court to the accounting performed by Cooper Norman prior to the current litigation based on the complex and multi-faceted expenses in running not only a single conventional dairy, but also in transitioning to the joint, organic operation.

Section IX.4 reads in full:

IX.4 Winding Up, Liquidation and Distribution of Assets.

Upon dissolution, an accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. Subject to the provisions of the next section below, the Manager shall immediately proceed to wind up the affairs of the Company. Distribution of assets and allocation of profits and losses shall be in accordance with Article VII hereof.

Nothing in this section of the Operating Agreement suggests that the parties intended for the accounting to occur in the way suggested by Gunstream, in which the heifers would be the financial responsibility of Dorsey Organics *prior* to their freshening. The district court's refusal to follow the explicit language "from the date of the last previous accounting until the date of dissolution" stands in direct contradiction to the plain language of the Operating Agreement. Further, prior accountings completed for Dorsey Organics had treated heifers as the responsibility of Dorsey Organics only *after* their freshening. Cooper Norman, Dorsey Organics' accounting firm, prepared the last previous accounting prior to dissolution in December 2017 when it prepared an accounting that appeared to have been used by all parties for their respective tax returns for the 2017 tax year. Based on the plain language of the Operating Agreement, Cooper Norman's accounting from December 2017 should have been used as the basis for the dissolution accounting.

Both Tom and Matt agreed to go into business together under the name Dorsey Organics, LLC, and mutually approved the LLC's Operating Agreement. As explained above, the district court erred when it did not follow the plain language of the Operating Agreement. Tom has not

provided any reasonable argument that justifies rejection of the parties' agreement in the way it was rejected by Gunstream and adopted by the district court. As a result, the district court erred when it failed to enforce the Operating Agreement and reached a result at odds with it.

### b. Startup Costs

Matt next argues that, when the district court adopted Gunstream's accounting, it incorrectly apportioned startup costs to Tom, which benefited Tom financially and which were purportedly incurred from April through December 2016. The district court concluded that Gunstream's methodology provided the best summation of the reimbursements owed to Tom.

According to Matt, attributing these startup costs to Tom was inappropriate for several reasons. First, the parties' initial capital contributions were established and memorialized in the capitalization recognition made effective as of January 1, 2016, the date on which the Operating Agreement retroactively came into effect. Matt relies on Section II.1.2 of the Operating Agreement, which does not allow additional capital contributions absent "approval by the holder or holders of a majority of Ownership Percentage Interests[.]" As pointed out by Matt, the Operating Agreement prevents Tom from obtaining reimbursement for contributions to the LLC's capital account that predated the creation of the LLC and the Operating Agreement absent Matt's approval. Matt also contends the additional expenses claimed by Tom were all associated with Tom's farming, an activity in which Dorsey Organics did not participate. Tom again asserts that the district court was well within its bounds to review the accounting methodologies from both parties' experts to determine what were and were not proper awards.

We conclude the district court erred in awarding Tom startup costs that were added to his capital contributions account in a way that was contrary to the plain language of the Operating Agreement. The district court erred when it adopted Gunstream's methodology, which awarded Tom an improper capital contribution. As explained above, the district court was not at liberty to rewrite the Operating Agreement. In addition to ignoring the Operating Agreement, the district court's credit to Tom for these additional startup costs was unsupported by the record. Fenton, Matt's expert, testified as follows:

> We[7] have gone through Tom's new claimed startup costs several times since he left the company and have identified those costs as either accounted for, paid to Tom, or as expenses that were spent for Tom personally. For instance, he claims

---

[7] It is unclear from the record whether Fenton's use of the pronoun "we" in his testimony refers to Matt and himself, other members of the Cooper Norman staff, or all of the above. However, since Fenton and Matt went over the startup costs after Tom left Dorsey Organics, it can be assumed that "we" likely refers to, at a minimum, Fenton and Matt.

the expense of irrigation equipment. He kept and sold that irrigation equipment with his real estate. The same goes for his farming expenses, for which he would have been paid when Dorsey Organics bought his feed. For the most part, it was quite clear Tom was claiming nearly every business expense that passed through his hands whether it was for Dorsey Organics, or he had already been repaid for the expense, or whether it was for his personal farming.

The district court did not make any explicit findings questioning Fenton's testimony, other than to reject it outright without comment or analysis. However, the district court adopted Gunstream's methodology on this matter in the same fashion that it used Gunstream's methodology to determine the parties' ownership interests in the heifers, which resulted in a rejection of the Operating Agreement in order to reach a result that was perceived as "fair" to the parties.

The district court reached its decision to increase Tom's capital account despite the Operating Agreement, which provided specific procedures for altering one's capital contributions. These additional contributions claimed by Tom were not reported until after January 1, 2016, the retroactive effective date of the Operating Agreement. As a result, these contributions cannot be credited to Tom absent approval by the holders of a majority of the Ownership Percentage Interests, *i.e.*, Matt. In sum, the district court erred when it credited additional capital contributions to Tom in the manner that it did.

2. <u>While Tom's Option may appear unambiguous on its face, it nevertheless contains several latent ambiguities</u>.

We now turn to the district court's interpretation of Tom's Option. The district court's analysis of Tom's Option suffers from the same flaw as did its analysis of the Operating Agreement: There was no resolution of whether the document was ambiguous.

"Interpreting an unambiguous contract and determining whether there has been a violation of that contract is an issue of law subject to free review. . . . [I]nterpreting an ambiguous term is an issue of fact." *Knipe Land Co.*, 151 Idaho at 454–55, 259 P.3d at 600–01 (internal citation omitted). Latent ambiguities arise "where an instrument is clear on its face, but loses that clarity when applied to the facts as they exist." *Id.* at 455, 259 P.3d at 601. When a latent ambiguity has been discovered, the next step is to determine the intent of the parties. *Id.*

As an initial point, the district court erred when it failed to first analyze and decide whether Tom's Option was ambiguous. *Id.* at 454–55, 259 P.3d at 600–01. We hold that Tom's Option has several latent ambiguities. Tom's Option is a document with a bulleted list of items that were discussed at a family meeting between Matt and Tom and their wives and reduced to a sheet of

notes by Fenton, Dorsey Organics' accountant, who was present and acting as a scrivener at the meeting. Despite the terms in Tom's Option appearing to be unambiguous, the vague nature of Tom's Option, particularly with respect to the question of whether the parties intended for Tom's Option to supplement the Operating Agreement, along with the parties' differing interpretations of the applicability of Tom's Option, point to latent ambiguities within the document. As this Court has previously described, "there are two points of analysis when determining whether an instrument contains a latent ambiguity: first, we examine the language of the instrument, including other writings incorporated into the instrument; and second, we examine the reasonable alternative meanings suggested by the parties as to language *within* the instrument." *Sommer v. Misty Valley, LLC*, 170 Idaho 413, 425, 511 P.3d 833, 845 (2021) (quoting *Porcello v. Estate of Porcello*, 167 Idaho 412, 424, 470 P.3d 1221, 1233 (2020)) (italics in original).

      *a. The wage provision in Tom's Option is ambiguous, so we remand this issue to the district court for it to determine the parties' intent.*

Matt and Dorsey Organics argue that the district court failed to enforce Tom's Option and instead substituted its own judgment in place of the agreement of the parties. Dorsey Organics also argues that the Operating Agreement gave Matt, as manager, the full "discretion to determine how much he and other members of the company would be compensated[.]"

Tom responds by attacking the credibility of Fenton and his opinions. Tom argues that, as a result of purported inconsistencies in Fenton's testimony, the district court properly relied on Gunstream's expert testimony regarding Matt's claim for wages. Regarding Tom's Option, Tom's only defense on appeal is that Tom's Option was void for its failure to comply with the Statute of Frauds, in reference to the land sale portion of the agreement. He did not argue that the remaining portions were void, unenforceable, or severable or that Tom's Option was not a valid exercise of Matt's discretion to determine compensation.

The district court concluded Matt's claim for roughly $200,000 in wages was not "reasonable" under the Operating Agreement. The district court further noted that, based on Tom's Option, the members agreed that the managing member should be paid $35 per hour but only "if there is money to pay it." The district court found, based on the losses from 2016–2018, that there was insufficient money to pay the full wages claimed by Matt. Instead, the district court awarded a significantly discounted amount as wages for Matt. The district court also eliminated all wages claimed by Matt for work performed after the organic herd was sold, concluding that he was not entitled to wages for work performed during the winding up and dissolution of Dorsey Organics.

21

To make Matt's prior wage claims "reasonable" within the confines of the Operating Agreement, the district court held that a "salary" would have been more appropriate than hourly wages given the number of hours Matt worked for the dairy operation. The district court never determined whether the $35 per hour provision in Tom's Option should impact the "reasonable" compensation provision in the Operating Agreement.

We hold the district court erred when it concluded that a salary instead of an hourly wage was the more "reasonable" form of compensation. *See* Article VIII, Section VIII.1 ("Each Manager shall be entitled to reasonable compensation[.]"). The parties never agreed that Matt and Krista would be paid a salary. There is nothing in the record to suggest that the parties agreed that a salary would be the more reasonable way to compensate the parties. Certainly, it was cheaper for Dorsey Organics to pay Matt a salary as opposed to paying him an hourly wage; however, the operative question is not what would be cheaper, but rather what the agreement of the parties was. We have frequently noted that we "will not substitute our view of the facts for the view of the district court." *Wilson v. Mocabee*, 167 Idaho 59, 64, 467 P.3d 423, 428 (2020) (internal citation omitted). Nevertheless, the district court is not entitled to make factual findings that lack any evidentiary support in the record. *Id.* In concluding that a salary would be more appropriate for a manager of a new company, the district court intuited additional terms that are not in the Operating Agreement.

The terms of the Operating Agreement explain that the parties had agreed to a definition of "reasonable" compensation, and Tom's Option suggests that they believed a reasonable compensation to be $35 per hour. On the other hand, Tom's Option was never signed by Tom or Matt even though they appeared to agree to it. Further, there is no other evidence in the record that would suggest the parties had intended for Tom's Option to constitute the "reasonable" compensation provision in the Operating Agreement. These differing interpretations must be resolved upon remand.

After identifying differing interpretations in the document, the next question is whether the parties intended to be bound by the wage provision in Tom's Option. *Knipe Land Co.*, 151 Idaho at 455, 259 P.3d at 601. Determining intent is a question for the factfinder, yet the district court never found what the parties meant by "reasonable" compensation. *See Kunz*, 162 Idaho at 439, 398 P.3d at 172. Accordingly, we deem it necessary to remand this question to the district court for its determination of what the parties intended as far as "reasonable" compensation in the Operating Agreement.

22

In addition to resolving the meaning of "reasonable" compensation, the district court must also consider Matt's claim for compensation while he wound up the affairs of Dorsey Organics. The district court previously erred when it failed to do so. The Operating Agreement plainly contemplated ongoing oversight by the Manager of the winding up of the LLC's affairs prior to and including dissolution:

> IX.4 Winding Up, Liquidation and Distribution of Assets.
>
> Upon dissolution, an accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. Subject to the provisions of the next section below, *the Manager shall immediately proceed to wind up the affairs of the Company*. Distribution of assets and allocation of profits and losses shall be in accordance with Article VII hereof.
>
> IX.5 Articles of Dissolution.
>
> As soon as the Company is dissolved, articles of dissolution shall promptly be executed and verified *by the Manager*. Such articles of dissolution shall be filed as soon as possible with the Idaho Secretary of State.

(Italics added.) Further, the Operating Agreement suggests that Matt is entitled to be compensated for the time that he worked for the company.

> VIII.1 General Management
>
> . . . Each Manager shall be entitled to *reasonable compensation* for services in that capacity and to reimbursement for reasonable and necessary costs and expenses incurred on behalf of the Company.

(Italics added.)

The Operating Agreement controls the obligations of the parties, and its provisions may not simply be disregarded. *Shawver*, 140 Idaho at 362, 93 P.3d at 693. Concluding that Matt cannot claim wages for the work he performed throughout the winding up and dissolution of the LLC is not only unsupported by the record, but it is also contrary to the express provisions of the Operating Agreement. Accordingly, the district court must also assess Matt's claim for compensation while he wound up the affairs of Dorsey Organics in its calculation of Matt's overall compensation.

> b. *We also vacate the judgment dismissing Matt's fourth and fifth claims for relief because the record contains no analysis for the district court's decision.*

In addition to the issues described above, Tom's Option apparently contemplated the sale of Dorsey *Farms* by Tom to Matt. The enforceability of this sale provision was the subject of Matt's fourth and fifth claims for relief. Count Four alleged breach of contract against Tom, Dana,

and the couple's trust for Tom's failure to follow through on the sale of Dorsey Farms. Count Five alleged constructive fraud against Tom for failing to sell the real property to Matt after saying he would. Tom moved for partial summary judgment on Counts Four and Five of Matt's third amended complaint.

The Special Master recommended that the district court grant summary judgment to Tom on Count Four of Matt's Third Amended Complaint because the land sale provision in Tom's Option could not be enforced because it did not comply with the Statute of Frauds. The Special Master further recommended that summary judgment be granted on Count Five of Matt's Third Amended Complaint because none of Matt's proffered defenses to the Statute of Frauds—fraud, equitable estoppel, or quasi-estoppel—applied because Matt was unable to prove "any false statement of fact on a material issue."

The district court's Judgment dismissed Counts Four and Five with prejudice, implying that Tom had prevailed on summary judgment. The record before us, however, does not contain any analysis by the district court regarding what it did or why it did it concerning the Special Master's recommendation to grant summary judgment. The district court referenced its purported grant of partial summary judgment in paragraphs eight and ten of its Conclusions of Law, but the paragraphs do not contain any substantive analysis of Tom's motion. The language in paragraphs eight and ten implies that Matt was allowed to put on evidence regarding the claims, even though they had been previously rejected by the Special Master on legal grounds. The two paragraphs read as follows:

> 8. Summary judgment having been granted to the defendants on the issue of the breach of contract on sale of real estate, and for any claim of fraud thereunder, it was not a breach of any agreement nor was it wrongful conduct for Tom to fail to agree to enter into a real estate contract [sic] any person or entity.
>
> . . . .
>
> 10. The plaintiffs have failed to prove that any defendant owed a fiduciary duty to any plaintiff. Tom Dorsey did not owe any fiduciary duty to anyone under the operating agreement of Dorsey Organics.

Apart from these brief references to summary judgment (and to a "fail[ure] to prove"), the only document that provides any insight as to how the district court *may* have analyzed Tom's partial summary judgment motion is the Special Master's Final Report. Our standard of review precludes us from affirming the district court's decision implicitly granting summary judgment to Tom on Matt's Counts Four and Five without any analysis. *Seccombe*, 115 Idaho at 435, 767 P.2d

at 278 ("The appointment of a master does not displace the district court's role as the ultimate trier of fact."). Without any analysis from the district court, we are unable to determine why it made the choices it did, much less review its decision for purported error.

When the record is otherwise clear, "[t]he absence of findings and conclusions may be disregarded by the appellate court[.]" *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 225, 646 P.2d 988, 996 (1982). However, in reviewing issues decided on summary judgment, "[t]his Court exercises free review over . . . the inferences drawn by the district judge to determine whether the record reasonably supports those inferences." *Intermountain Forest Mgmt., Inc. v. La. Pac. Corp.*, 136 Idaho 233, 236, 31 P.3d 921, 924 (2001).

Our review of the record, including the district court's Findings of Fact and Conclusions of Law, does not present a clear resolution of the issues presented at summary judgment. Accordingly, we are unable to ignore the lack of analysis by the district court. *Pope*, 103 Idaho at 225, 646 P.2d at 996. As a result, we find it necessary to remand this issue to the district court to determine whether summary judgment should have been granted to Tom on Matt's Fourth and Fifth Claims and if it was not, to conduct a trial to resolve the issues.

### C. The district court erred when it required Matt to prove fraud regarding Tom's weight tickets, rather than placing the burden of proof on Tom to show that he was entitled to his requested payment for feed.

During the winding up accounting, Tom claimed that Dorsey Organics owed him additional payment for feed that he had purportedly provided to Dorsey Organics. In support of his claim, Tom produced several weight tickets from "months after the feed was allegedly sold." Matt and Dorsey Organics both argued that the weight tickets had been "fabricated" and that the district court should not rely on the tickets in reviewing the final accounting.

The district court concluded that the weight tickets had not been obviously tampered with and were instead in an imperfect condition given the "rough field conditions with several individuals having access to the tickets and being involved with entries[.]" The district court then placed the burden of proof on Matt to prove fraud by clear and convincing evidence. The district court found that Matt had failed to prove fraud, finding that any purported inconsistencies in the weight tickets appear to be "a normal occurrence."

Matt and Dorsey Organics argue that the district court erred as a matter of law because "[it] placed the burden of proof on [Matt] to prove fraud [regarding the weight tickets], rather than placing the burden of proof on Tom to prove he was entitled to additional payment for feed from

25

Dorsey Organics." Tom argues that any disagreements with the accounting results are unpersuasive because Matt has not shown that the district court's decision is clearly erroneous.

The determination of where a burden of proof lies is a question of law, over which we exercise free review. *U.S. Bank Nat'l Ass'n N.D. v. CitiMortgage, Inc.*, 157 Idaho 446, 452, 337 P.3d 605, 611 (2014) (internal citation omitted) (holding that a determination of the burden of proof is a question of law). This Court has previously explained that "[t]he party called upon to render an accounting bears the burdens of production and persuasion." *Watson v. Watson*, 144 Idaho 214, 219, 159 P.3d 851, 856 (2007).

Here, contrary to the conclusion of the district court, Matt was not required to prove fraud. Tom, as the person claiming entitlement to a credit in an accounting, was the person who bore the burden to prove entitlement to that credit. It was not Matt's obligation to prove the weight tickets were fraudulent. Matt argued at trial that Tom's proffered evidence was insufficient to support his request for additional feed credits in the final accounting. The district court apparently misunderstood who bore the burden of proof during the process of winding up and accounting. In essence, the district court concluded that Tom succeeded in proving his entitlement to the weight tickets only because Matt had failed to prove that the weight tickets had been fraudulently produced, not because Tom had initially satisfied his burden of proof.

We hold that the district court erred as a matter of law when it did not appropriately apply the burden of proof. Tom initially bore the burden of proving entitlement to payment for having provided feed to Dorsey Organics. As an affirmative defense to Tom's claim, Matt did not have the burden to prove the weight tickets were fraudulent unless and until Tom established an entitlement to his claim. As a result, the district court erred when it improperly placed the burden of proof on Matt to initially demonstrate fraud regarding the weight tickets. Because the district court applied the incorrect burden of proof, the district court erred as a matter of law. This issue is remanded to the district court. The burden to prove entitlement to the credit is Tom's and he will need to prove that entitlement by a preponderance of the evidence. Only if Tom can do so does Matt's allegation of fraud arise. *See, e.g.*, *Kelley v. Wheyland*, 93 Idaho 735, 738, 471 P.2d 590, 593 (1970).

**D. The district court erred when it failed to analyze whether Matt's contribution to the production of crops on the Holton Place altered the presumption of equal ownership in the crops produced on the Holton Place.**

The Holton Place was equally owned by Tom and Matt but farmed solely by Matt.[8] Matt did not pay rent for the Holton Place (as a one-half owner) but did apparently pay for all the taxes and all the water used on the property. He also spent significant time farming the property by himself without any assistance from Tom. The district court first found that because Tom and Matt jointly owned the Holton Place both parties should be credited *equally* with the crops grown on the property. The district court found that Matt had offered no records in support of his claims that he had paid for the water and taxes, nor was there any evidence of an agreement regarding the farming of the Holton Place. Instead, the district court concluded the distribution of the crop should be fifty percent to each, in accordance with Tom's and Matt's equal ownership of the Holton Place.

On appeal, Matt argues that the district court erred in crediting half the crop from the Holton Place to Tom and half to Matt. Matt contends that the cost of the water and taxes was greater than the fair market value of the rent for the property, so crediting half the crop to Tom essentially resulted in a windfall for Tom. Tom "received this award without a concurrent debit for expenses or improvements[;] all expenses were left with Matt." Tom argues that Matt did not pay rent for the property, so he should not be credited for the crops it produced.

The district court's conclusion regarding the crops grown on the Holton Place is not only unsupported by the evidence in the record but also a misapplication of the law. First, it appears undisputed that Sunnyslope (Matt's LLC) farmed the Holton Place without assistance from Tom during Matt's and Tom's involvement with Dorsey Organics and prior to Dorsey Organics' creation. It had been previously farmed by Sunnyslope, which was operated by Matt. The district court gave little weight to Matt's testimony because it was not supported by written documentation. However, in reaching its conclusion, the district court rejected Matt's testimony even though it apparently was not contradicted.

---

[8] The partition of the Holton Place was at issue before the Special Master. However, during the litigation below, the parties apparently stipulated to the sale of the Holton Place, and neither party presented any evidence regarding the partition of this property. Because a signed stipulation was never presented, the claim for partition of the Holton Place was dismissed without prejudice. The only remaining dispute on appeal regarding the Holton Place pertains to the crops grown on it and the resulting feed credits.

This Court has previously explained that finders of fact are not at liberty to reject uncontradicted testimony unless the fact finder concludes that the witness lacks credibility, which the district court did not do here. *See In re Doe*, 142 Idaho 594, 598, 130 P.3d 1132, 1136 (2006).

Second, the district court's determination of ownership of the crops grown on the Holton Place was flawed. The district court reasoned that each party was entitled to fifty percent of the crops because they equally owned the Holton Place. However, this finding results in Tom receiving the benefit of half the value of the crops grown on the Holton Place without being apportioned "a concurrent debit for expenses or improvements[.]" In doing so, the district court failed to analyze whether Matt and Tom had intended for the parties to reap the benefits of Matt's farming equally or whether Matt should be entitled to an increased credit for the expenses he undertook to produce the crops. This Court has previously held that when one joint tenant improves or makes some other benefit for the shared property, he is "entitled to contribution" by the cotenant when those expenses are "incurred fairly and in good faith for the benefit of the common property[.]" *Keyser v. Morehead*, 23 Idaho 501, 506, 130 P. 992, 994 (1913); *see also Bahnmiller v. Bahnmiller*, 145 Idaho 517, 522, 181 P.3d 443, 448 (2008) (holding that a tenant in common "was entitled to contribution for the payments he made on the promissory note and the real estate taxes [for the equally owned property]").

The district court's conclusion to award Tom credit for half the crops grown at the Holton Place is unsupported by and contrary to the record. It also fails to analyze whether Tom should have borne the responsibility for sharing the costs associated with Matt's farming. This conclusion arguably unjustly enriched Tom and failed to credit Matt for his time and the expenses he incurred in farming the Holton Place. Without any analysis by the district court regarding how the parties intended to divide the proceeds or share the expenses created by farming the Holton Place, we find it necessary to remand this issue to the district court for a determination of whether Tom should have shared in the expenses in farming the Holton Place.

**E. We remand the question of whether Dorsey *Farms* owed money to Sunnyslope because the district court failed to consider all the evidence concerning this issue.**

Matt argues that the district court erred in seemingly disregarding "reciprocal claims of the farms [Dorsey *Farms* and Sunnyslope] against each other for monies owed." The district court concluded that the Ninth Cause of Action in Matt's third amended complaint had failed. (Matt's Ninth Cause of Action involved a claim by Sunnyslope against *Dorsey Farms* for goods sold and delivered.) The district court's findings on this matter were:

28

68. [Matt] offered Exhibits 49 through 52 upon testimony of Matt that the documents contained information pertaining to a claim by Sunnyslope against Dorsey *Farms* pertaining to the sale and delivery of silage by Dorsey *Farms* to "Lindley," an unrelated third-party farming operation belonging to another that Sunnyslope assisted Dorsey *Farms* in completing. The claim is for $13,258.68.

69. The offered exhibits do not track the proffer nor explain the claim in any understandable way[.]

(Italics added.)

The problem with the district court's analysis is that it failed to consider Exhibit 48. Matt argues that the district court erred because it failed to reach a conclusion regarding the evidentiary support from Exhibit 48, which detailed the offsets that he claimed Dorsey *Farms* owed to Sunnyslope. Since this exhibit supports Sunnyslope's claim, Matt argues the district court erred in rejecting the claim as not having any evidentiary support. We agree.

Matt and Tom both testified at the hearing that Exhibit 48 was a spreadsheet detailing the work that Dorsey *Farms* did for Sunnyslope and vice versa. Matt categorized these as "in[t]er-company transactions" that did not involve Dorsey *Organics*. The district court offered no explanation for why it chose to ignore Exhibit 48 despite the parties' apparent agreement on its relevance and applicability.

We hold that the district court erred when it failed to consider the effect of Exhibit 48. The district court has an obligation to consider relevant evidence. *See* I.R.E. 102, 402; *cf. Doe v. Doe*, 150 Idaho 46, 244 P.3d 190 (2010) (reversing a magistrate court's decision where "the magistrate court failed to adequately consider . . . evidence of just cause").

This Court's review is limited in such a way that we are unable to draw our own factual determinations of evidence in the same manner that a trier-of-fact would. Without an explanation from the district court about what the result would have been if it had considered Exhibit 48, we cannot resolve this issue on appeal. As a result, we find it necessary to remand this issue to the district court for it to determine whether Exhibit 48 affects the analysis of whether Dorsey *Farms* owes money to Sunnyslope and, if it does, to explain its application and the amount ultimately owed.

**F. The district court erred when it applied Idaho Code section 30-25-405 because its findings were internally contradictory on this issue.**

Next, Matt argues that the district court erred in concluding that he wrongly withdrew money from Dorsey Organics' accounts in violation of Idaho Code section 30-25-405, which prohibits distributions when a draw would result in the company becoming insolvent:

> A limited liability company may not make a distribution, including a distribution under section 30-25-707, Idaho Code, if after the distribution:
>
> (1) The company would not be able to pay its debts as they become due in the ordinary course of the company's activities and affairs; or
>
> (2) The company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the company were to be dissolved and wound up at the time of the distribution, to satisfy the preferential rights upon dissolution and winding up of members and transferees whose preferential rights are superior to the rights of persons receiving the distribution.

I.C. § 30-25-405(a). Additionally, Idaho Code section 30-25-105(d)(1)(B) allows an operating agreement to amend this prohibition, "so that the prohibition requires only that the company's total assets not be less than the sum of its total liabilities."

The district court concluded that Matt's "$285,000 capital withdrawal took the resources of the company below that required to meet unpaid expenses, even after accounting for the proceed[s] of [the] sale of the dairy herd." Further, the district court found that this withdrawal occurred in 2018, prior to the dissolution and winding up process, so it could not be said whether the withdrawal would impact Dorsey Organics' creditors. "As such, the capital withdrawal should be included in the resources for adjustment in reconciling the accounts in the process of winding up."

Matt argues that, at the time of the draw, Dorsey Organics had sufficient funds to pay him, and that Idaho Code section 30-25-405 only prohibits distributions when a draw would prevent the company from otherwise being able to pay its debts. Tom argues that the district court properly considered evidence from both accounting experts and, after weighing the evidence, sided with Tom's expert.

Whether Dorsey Organics would have been unable to pay its debts if Matt had withdrawn $285,000 from the LLC's members' equity is a question of fact, while the district court's application of Idaho Code section 30-25-405 is a question of law over which we exercise free review. "[T]his Court exercises free review over the district judge's conclusions of law[,]" and

findings of fact will be reviewed for clear error. *Frost v. Gilbert*, 169 Idaho 250, 262–63, 494 P.3d 798, 810–11 (2021) (internal quotation marks and citations omitted).

As explained by Matt, at the time Dorsey Organics began to liquidate its assets in early 2018, Tom had previously taken a total of $200,647 in draws as a 19% owner and Matt had previously taken only $62,331 as an 81% owner. Matt authorized and took an additional $285,000 draw later in 2018. Dorsey Organics' cattle were sold in 2018 for roughly $800,000. Matt testified at the hearing that, at the time he took the $285,000 draw, the members' equity in Dorsey Organics was $663,524. The district court also found that the only remaining liabilities for Dorsey Organics in 2018 were unpaid wages due to Matt and Krista. Consequently, the district court's conclusion that this 2018 draw violated section 30-25-405(a) contradicts Matt's testimony and is not supported by substantial and competent evidence. In essence, the district court found that Matt's draw would have prevented Dorsey Organics from paying its debts while it also concluded that Dorsey Organics' only liabilities were those owed to Matt and Krista.

Further, the district court made no attempt to reconcile or align the relative draws taken by Tom and Matt given their respective ownership in the LLC or to apply the specific language of the Operating Agreement to Matt's draw. Idaho Code section 30-25-105(d)(1)(B) permits an operating agreement to "[a]lter" the prohibition against distributions described in section 30-25-405(a)(2). Section II.7 of the Operating Agreement alters this prohibition in the statute and requires draws to be distributed "pro rata according to the Member's respective Ownership Percentage Interests *to the extent of available funds as determined by the Manager in the Manager's sole discretion, which determination shall take into account any projected operating expenses*[.]" (Italics added.) As noted, the record does not support the district court's apparent finding that Dorsey Organics was insolvent, or likely to become insolvent, at the time Matt took a draw from the company in 2018. It is difficult to understand why the district court disallowed the draw on the basis that it would render Dorsey Organics insolvent when the court also decided the only liabilities identified were monies owed to Matt and Krista. Finally, the district court's conclusion failed to account for the discretion afforded to the Managing Member by the Operating Agreement.

In sum, the district court erred when it concluded that Matt's draw violated Idaho Code section 30-25-405(a). Section 30-25-405(a) only prevents an LLC from making a distribution if the LLC would be otherwise unable "to pay its debts[.]" Here, there was no evidence that Dorsey Organics had any outstanding liabilities other than to Matt and Krista, so the district court erred

when it applied Idaho Code section 30-25-405(a) to justify deducting the draw from Matt's side of the ledger in the final accounting.

## G. The district court erred in concluding that Tom did not wrongfully dissociate from Dorsey Organics.

Matt alleged in his complaint that Tom was liable for damages based on wrongful dissociation under Idaho Code section 30-25-602. The district court concluded that none of Tom's actions could be construed as wrongful dissociation because "[i]t is not an act of dissociation to offer to sell one's interest to another member, or to refuse to enter into a continuing contract with the company." The district court explained that Tom had previously sold his conventional dairy herd "[i]n early spring of 2016[.]" With the proceeds from the sale of Tom's conventional dairy herd, "Matt purchased 90 head of qualified organic dairy cows[.]" The district court found that "[t]hese organic dairy cows were the initial production animals used by Dorsey Organics, and provided the basis for the initial capital assigned to Matt and Tom." Given this initial contribution, the district court found that both Tom and Matt continued to be members of Dorsey Organics until Matt sold the Dorsey Organics herd at auction in 2018 and only at that point did the LLC cease to exist. At no point did Tom or Matt agree that Tom was no longer a member of the LLC. In fact, both parties continued to list him as a member of Dorsey Organics on their tax returns. As a result, the district court concluded that, although neither party could come to an agreement on the winding up of Dorsey Organics, both Tom and Matt remained members of the LLC until the herd was sold in 2018.

On appeal, Matt argues that the district court's conclusion that Tom did not wrongfully dissociate from Dorsey Organics is incorrect because Tom's refusal to participate in the winding up of Dorsey Organics after the sale of Dorsey Organics' herd in 2018 constituted a wrongful dissociation. Matt relies on the proposal ("Tom's Ultimatum") from Tom to Dorsey Organics in support of his claim that Tom wrongfully dissociated. In that proposal, Tom wrote "PAY DORSEY FARMS $541000.00 [sic] ON CATTLE OR CATTLE WILL BE REMOVED AND I WILL NO LONGER BE PART OF DORSEY ORGANIC [sic][.]" (Capitalization in original.) According to Matt, Tom had already received a credit in Dorsey Organics' accounts at the creation of the LLC for the value of Tom's cattle, so he was not entitled to an additional $541,000. Additionally, Tom's Ultimatum left Dorsey *Organics* with only a month-to-month rental agreement of the Dorsey *Farms* dairy facility, which was not acceptable to Sorrento and caused Sorrento to terminate its contract with Dorsey *Organics* to purchase organic milk. The inability to

32

contract with Sorrento forced Matt to sell the cows at auction, which triggered the dissolution of Dorsey Organics. In the alternative, Matt also argues that the district court erred in this respect because the dissolution could have occurred as early as when Tom brought forth his ultimatum. Matt argues that Tom's Ultimatum constituted a communication of Tom's express threat to dissociate, and when Dorsey Organics refused his ultimatum, Tom's dissociation resulted. Matt contends that, under Idaho Code section 30-25-601, Tom wrongfully dissociated when he withdrew from Dorsey Organics as prohibited by the Operating Agreement.

Tom argues that he never dissociated from Dorsey Organics because he never had any authority within the company. Instead, he argues, Matt repeatedly excluded him from business decisions related to Dorsey Organics, so to argue that Tom was responsible for his own lack of involvement within Dorsey Organics is inaccurate.

We hold that the district court erred in concluding that Tom did not wrongfully dissociate from Dorsey Organics. Tom's Ultimatum stated that, if Dorsey Organics refused his offer, then he would no longer be involved with Dorsey *Organics*. After Dorsey *Organics* refused his offer, Tom would only allow Dorsey *Organics* to lease Dorsey *Farms* on a month-to-month basis, which caused Sorrento to terminate its contract with Dorsey *Organics*. Without a facility in which to produce organic milk for Sorrento, the continuation of Dorsey Organics' operations became untenable, so Matt had no other option but to sell Dorsey Organics' herd at auction. Tom refused to participate in this process and in the subsequent winding up of Dorsey *Organics*.

Tom's acknowledgement that he refused to participate in the operation of Dorsey *Organics* prior to the completion of it winding up its affairs is sufficient evidence to meet the first prong of wrongful dissociation under section 30-25-601(b)(2). I.C. § 30-25-601(b)(2) (prohibiting dissociation prior to "the completion of the winding up"). However, the district court did not discuss this fact, nor did it decide whether Tom's Ultimatum constituted an "express will" to withdraw as that term is used in the dissociation statute. Because the district court failed to consider evidence in the record of Tom's dissociation, namely Tom's Ultimatum, its conclusion that Tom remained a member of the LLC is unsupported by the record and as a result clearly erroneous.

Idaho Code section 30-25-601(b) provides that a member's dissociation is wrongful if the dissociation "[i]s in breach of an express provision of the operating agreement; or . . . [o]ccurs

33

before the completion of the winding up of the limited liability company and . . . [t]he person withdraws as a member by express will[.]" In this case, Dorsey Organics' rejection of Tom's Ultimatum  resulted in Tom's refusal to allow a long-term lease of Dorsey *Farms*  that forced the sale of Dorsey *Organics'* herd. Tom's subsequent lack of participation in Dorsey *Organics* constituted both a breach of the Operating Agreement and a manifestation of Tom's decision to withdraw from Dorsey *Organics*.

It should be noted that the Operating Agreement does not authorize any right to withdraw for a member. The Operating Agreement states: "A Member shall have no right to withdraw from the Company, but in lieu thereof shall have the rights [to sell his interest in the Company to the Company]." Tom's Ultimatum was not an offer to sell his interest in Dorsey *Organics*, but instead was a demand for payment on behalf of *Dorsey Farms*. Even if it were an offer to sell, Dorsey Organics was within its rights to decline such an "offer." When Dorsey *Organics* refused Tom's Ultimatum, Tom's withdrawal and disallowance of the long-term use of Dorsey *Farms'* facility, necessitating the sale of Dorsey *Organics'* herd (which was contrary to the Operating Agreement) became a *fait accompli* for Matt. As a result, Tom's dissociation was wrongful pursuant to the Operating Agreement and Idaho Code section 30-25-601(b)(1). The district court erred when it found otherwise since its decision is not supported by substantial and competent evidence.

The district court further erred when it concluded only that "[n]o action by Tom was an act of dissociation[.]" The district court limited its analysis to the confines of the Operating Agreement and determined that because no agreements had been reached regarding buying out Tom's interests, "[t]he limited liability company continued its existence with both members until the dairy herd was sold[.]" As noted, Tom had already received a credit in Dorsey *Organics* for his contribution to the LLC's herd, and he would not be entitled to receive both the credit to LLC's capital account and a forced buy out of the cattle that constituted his capital contribution to Dorsey *Organics*. Though it is true that no agreements were reached regarding a buyout, Tom's other acts, *i.e.*, communicating the ultimatum, and forcing Dorsey *Organics* to be limited to a month-to-month lease of Dorsey *Farms*, constituted a wrongful dissociation.

Tom makes much of the fact that Matt made most of the decisions for Dorsey *Organics* and Tom claims he was excluded from any kind of participation in the LLC's operation. Despite Tom's argument, Matt's conduct was consistent with his authority as spelled out in

the Operating Agreement and his status as the majority member of Dorsey Organics. Section VIII.1 of the Operating Agreement states "[t]he business of the Company shall be conducted under the management of one Manager, who *shall have exclusive power to manage the business and affairs of the Company and authority to act for the Company in all matters*." (Italics added.) While it is true that Tom's participation in Dorsey Organics was much less than Matt's, Tom agreed to Matt's authority as Manager when he signed the Operating Agreement. To the extent that "Tom was systematically excluded from all aspects of Dorsey Organics[,]" that exclusion was consistent with the terms of the Operating Agreement. In summary, the district court's finding that Tom did not wrongfully dissociate from Dorsey Organics when he communicated his ultimatum is clearly erroneous as it is not supported by substantial and competent evidence.

### H. The district court did not err in denying an award of attorney fees to Tom because he was not the prevailing party.

In the second of the consolidated cases before this Court (docket number 49417), Tom appeals the district court's decision to deny his request for attorney fees and costs below. The district court granted Matt's Motion to Disallow the Defendant's Claim for Fees and Costs. The district court determined that, pursuant to Idaho Rule of Civil Procedure 54, costs would not be awarded to Tom or to Matt because each party prevailed in part and, therefore, neither was a prevailing party. The district court next determined that the "accounting and dissolution of Dorsey Organics . . . was the thrust of the case." The district court then concluded that Tom was not entitled to attorney fees under Idaho Code section 12-120(3) because "the gravamen of this case doesn't involve a financial – a commercial transaction. Rather the gravamen of this case is the dissolution and accounting for the dairy." The district court further concluded that neither party was entitled to attorney fees under section 12-121 because there was no "frivolous conduct on the part of any party in this case."

On appeal, Tom argues that the district court erred when it failed to award attorney fees pursuant to section 12-120(3) because the primary issue in this case was "the attempted purchase and sale of Tom's farm and dairy operation[.]" Tom continues and argues that a commercial transaction was involved because "[t]he purpose of Dorsey Organics, LLC[,] was, in part, an estate planning and asset transfer device for Thomas E. Dorsey." Therefore, according to Tom, the district court erred when it concluded that the gravamen of the case was "the dissolution and accounting for [Dorsey Organics,]" rather than the transfer of the family farm.

Matt argues the opposite—that Dorsey Organics' winding up is not a commercial transaction and, therefore, not a sufficient basis for an award of attorney fees. Because the district court dismissed all claims but the request for accounting, Matt contends that this case is purely a statutory proceeding pursuant to Idaho Code section 30-25-801 (authorizing direct action by members in limited liability companies).

We affirm the district court's denial of attorney fees because Tom was not the prevailing party before the district court. We review determinations of prevailing parties under an abuse of discretion standard. *Eighteen Mile Ranch, LLC v. Nord Excavating & Paving, Inc.*, 141 Idaho 716, 718–19, 117 P.3d 130, 132–33 (2005) (internal citation omitted). A prevailing party will be "examined and determined from an overall view, not a claim-by-claim analysis." *Id.* at 719, 117 P.3d at 133. For that reason, "when both parties are partially successful, it is within the district court's discretion to decline an award of attorney fees to either side." *Jorgensen v. Coppedge*, 148 Idaho 536, 538, 224 P.3d 1125, 1127 (2010) (internal citation omitted).

The district court concluded that this "was a very complicated case," that Matt prevailed on some of his claims, Tom prevailed on some of his, and the remaining causes of action were dismissed or resolved by stipulation. In its decision denying fees, the district court went through each claim and stated on the record its resolution and found that, given the overall resolution of the case, neither party had prevailed. The district court stated on the record the applicable rules of procedure and case law and how it used those rules to guide its determination of a prevailing party for purposes of awarding attorney fees and costs.

Tom has failed to provide any argument explaining how the district court abused its discretion in declining to find that he was the prevailing party. Accordingly, we affirm the district court's denial of attorney fees to Tom.

Because we have affirmed the district court's conclusion that Tom was not the prevailing party before the district court, we conclude he was not entitled to fees under Idaho Code section 12-120(3) or 12-121. *See Eighteen Mile Ranch, LLC*, 141 Idaho at 721, 117 P.3d at 135. In sum, we find no error in the district court's denial of Tom's request for attorney fees following the case resolution in the district court.

## I. Neither party is entitled to attorney fees on appeal.

Tom seeks attorney fees on appeal pursuant to Idaho Code sections 12-120(3) and 12-121. However, both code sections allow only the *prevailing* party to receive an award of attorney fees.

36

As described throughout this opinion, Matt successfully demonstrated several errors in the district court's decision. In addition, Tom failed on his appeal of the district court's decision not to award attorney fees. Accordingly, Tom is not the prevailing party on appeal. Because we conclude Tom is not the prevailing party on this appeal, he is not entitled to attorney fees under either provision.

Matt also seeks attorney fees only under Idaho Code section 12-121. As a threshold matter, we find that Matt is the prevailing party on appeal because he demonstrated that many of the district court's findings were clearly erroneous. Additionally, Matt prevailed on Tom's appeal because we affirmed the district court's decision to deny attorney fees to Tom. Having concluded that Matt is the prevailing party on appeal, we nevertheless deny his request for attorney fees pursuant to Idaho Code section 12-121. We cannot conclude that Tom brought, pursued, or defended this appeal frivolously, unreasonably, or without foundation. As a result, we decline to award attorney fees on appeal against him based on Idaho Code section 12-121. We award costs as a matter of right to Matt. I.A.R. 40.

## V. CONCLUSION

For the foregoing reasons, we conclude that the district court erred in failing to independently review the record before adopting the Special Master's Proposed Findings of Fact and Conclusions of Law. In addition, we vacate the district court's conclusions regarding:

- Its failure to apply Dorsey Organics' Operating Agreement, including its adoption of an accounting methodology that failed to follow the Operating Agreement;
- Its failure to analyze Tom's Option, prior to considering whether to apply its terms. (We also remand the issue regarding partial summary judgment in favor of Tom on the claims of breach of contract and constructive fraud because the record is silent on whether the district court ever adequately analyzed this question);
- Its requirement that Matt had to prove fraud regarding Tom's weight tickets before deciding whether Tom had proven an entitlement to a credit for his weight tickets;
- Its conclusion that Tom was entitled to fifty percent of the crops grown on the Holton Place;
- Its decision regarding whether Dorsey *Farms* owed money to Sunnyslope;
- Its application of Idaho Code section 30-25-405 as it applied to Matt's draw; and
- Its decision regarding Tom's dissociation from Dorsey Organics.

37

Finally, we affirm the district court's denial of attorney fees to Tom in the proceedings below and deny attorney fees to either party on this appeal, although we award costs as a matter of right to Matt.

Chief Justice BEVAN, and Justices BRODY, MOELLER and ZAHN CONCUR.